UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

SYLVIA BOWEN-HOOKS,

                Plaintiff,

        v.

CITY OF NEW YORK, DAVID M. FRANKEL,
COMMISSIONER OF CITY OF NEW YORK
DEPARTMENT OF FINANCE, LINDSAY EASON,
SHERIFF OF CITY OF NEW YORK, TIMOTHY
LAROSE, CHIEF OF OPERATIONS,OLIVER
PU-FOLKES, FIRST DEPUTY, and PETER
SAMMARCO, DIRECTOR OF STRATEGIC
OPERATION AND INTEGRITY,

                Defendants.

**MEMORANDUM & ORDER**
10-CV-5947 (MKB)

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Sylvia Bowen-Hooks brings the above-captioned action against Defendants City

of New York, Commissioner David Frankel, Sheriff Lindsay Eason, Chief of Operations

Timothy LaRose, First Deputy Sheriff Oliver Pu-Folkes and Chief of Staff Peter Sammarco,

alleging claims of race and gender discrimination, retaliation and creation of a hostile work

environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

("Title VII"), 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Exec. Law § 290

*et seq.* ("NYSHRL") and the New York State Constitution, the New York City Human Rights

Law, N.Y.C. Admin. Code § 8–101 *et seq.* ("NYCHRL"), and violations of the Equal Pay Act,

29 U.S.C. § 206(d).  Plaintiff also brings suit pursuant to 42 U.S.C. § 1983 alleging deprivation

of due process and equal protection in violation of the Fourteenth Amendment and retaliation in

violation of the First Amendment of the United States Constitution.  Defendants moved for

summary judgment as to all claims.  At oral argument the Court dismissed Plaintiff's (1) Equal

Pay Act claims, (2) race and gender discrimination claims under Title VII against all individual

Defendants, (3) § 1981 claim for race discrimination against all individual Defendants sued in

their official capacity, and against the City of New York, (4) § 1981 and § 1983 claims against

Commissioner David M. Frankel, and (5) due process claim to the extent a due process claim

was alleged.[1]  For the reasons set forth below, the Court grants Defendants' motion for summary

judgment as to all of Plaintiff's claims under federal and state law, and declines to exercise

jurisdiction over Plaintiff's claims under the NYCHRL which are dismissed without prejudice.

## I.    Factual Background

### a.    Plaintiff's duties in the Sheriff's Office

Plaintiff is employed as a lieutenant in the Sheriff's Division of the Department of

Finance ("Sheriff's Office").  (Defs. 56.1 ¶ 1; Pl. 56.1 ¶ 1.)  Plaintiff began working with the

Sheriff's Office in 1986, and the Sheriff's Office became part of the Department of Finance

("DOF") in 1995.  (Defs. 56.1 ¶ 3; Pl. 56.1 ¶ 3.)  Plaintiff was promoted to the position of

lieutenant in 1997, after passing a civil service test and being selected from an eligible list.[2]

(Defs. 56.1 ¶ 4; Pl. 56.1 ¶ 4.)  Plaintiff worked in an office in Manhattan between 1997 and 2004.

(Defs. 56.1 ¶¶ 12–15; Pl. 56.1 ¶¶ 12–15.)  In 2004 Plaintiff was transferred to the office at 30-10

Starr Avenue in Long Island City, where she was assigned to the Scofflaw Tow Unit to work as a

contracts manager until 2007, overseeing contracts between the DOF and private towing

---

[1]  Plaintiff withdrew her claims for failure to promote, failure to receive discretionary
pay, and her claims pursuant to the Lily Ledbetter Fair Pay Act, 42 U.S.C.A. § 2000e–5(e)(3).
(Pl. Opp'n 5.)

[2]  Based on the record, the Court understands the hierarchy of the Sheriff's Office, from
highest- to lowest-ranked, to be: Sheriff; First Deputy; Undersheriff, also known as Chief;
Lieutenant; and Sergeant.

companies. (Defs. 56.1 ¶¶ 17, 20, 25; Pl. 56.1 ¶¶ 17, 20, 25, 30; Pl. Dep. 34:2–10, 37:15–17.)

According to Plaintiff, she was the only African-American female lieutenant, and the position of

contract manager was an undesirable and burdensome position that previously had never been

assigned to any lieutenant. (Pl. 56.1 ¶¶ 26, 28, 36; Pl. Dep. 37:25–38:7, 54:13–15.) She was not

given any preparation to fulfill the responsibilities of the position, did not like the work, and

voiced objections to her supervisor.[3] (Defs. 56.1 ¶ 23; Pl. 56.1 ¶ 23; Pl. Dep. 38:8–21.)

In addition to her duties as contract manager in the Scofflaw Tow unit, Plaintiff was also

assigned to work in other units, including working security detail for buildings beginning

sometime after 2004,[4] working as a lieutenant in the cigarette tax unit beginning in 2006 — her

primary assignment — performing duties in the warrants unit under the title of "community

coordinator," assisting in the auction unit and the auto theft unit beginning in 2006, assisting

sergeants assigned to other units if and when they required it, and assisting with personnel needs

across multiple units as needed. (Defs. 56.1 ¶¶ 20, 31–36; Pl. 56.1 ¶¶ 31–36; Pl. Dep. 37:15–16,

50:15–53:10.) Plaintiff claims that having responsibilities spread across several units placed her

at a disadvantage relative to the white male lieutenants, who were permitted to concentrate on

just one unit, and that the additional responsibilities were given to her in or around June 2006,

---

[3] The parties disagree as to how onerous the duties of contract manager were. According
to Defendants, the position involved attending two to three meetings a year, where Plaintiff's
"only responsibility was to be present and listen." (Defs. 56.1 ¶¶ 26–27.) According to Plaintiff,
the position was "problematic and objectionable," and while Plaintiff did not say how much
work she had to do to prepare for the long meetings, she stated that "they didn't give me any
tools." (Pl. Dep. 45:3–16.) In addition, Plaintiff states she was required to track and evaluate the
performance of contractors as part of her duties as contract manager. (Pl. 56.1 ¶¶ 26–29.)
Plaintiff claims that none of the other lieutenants, all of whom were white males, had to "deal
with" the title of contract manager, and none of the "top managers" wanted to be contract
manager, which is why they made her, the only female lieutenant, a contract manager. (Pl.
Dep. 38:2–25.)

[4] The parties refer to this as working in "DECAS," although this term is not defined in
the record.

immediately after she filed an internal EEO complaint.  (Defs. 56.1 ¶ 38; Pl. 56.1 ¶¶ 38, 55; Pl.

Dep. 39:13–19, 40:21–41:14, 51:6–8, 61:12–21; Defs. Ex. D, Deposition of Timothy LaRose

("LaRose Dep.") 43:2–3.)

### a.    2006 window covering incident

According to Plaintiff, when she began working in the office at 30-10 Starr Avenue in

2004, all of the offices in the building had already been allotted to the white male lieutenants,

leaving her as the only lieutenant who was not allotted an office.  Plaintiff found and used a

"tape room" off the main hallway as her office.  (Pl. Dep. 62:22–63:5, 218:14–220:4.)  The door

to this room had a window, which Plaintiff covered with opaque material.  (Pl. Dep. 63:5–6.)

Plaintiff covered the window because she counseled deputies in her office, which required

privacy, and because she occasionally changed in her office.  (Defs. 56.1 ¶ 70 (citing Pl. Dep.

220:23–221:16); Pl. 56.1 ¶ 70 (citing Pl. Dep. 62:22–25, 63:1–6).)  Plaintiff's office was off the

main hallway with ample foot traffic, whereas the offices of all the other lieutenants were either

inside a larger room, or had solid wood doors.  (Pl. Dep. 217:21–219:6, 220:17–221:16.)

In April or May of 2006, Sammarco began working in the office at 30-10 Starr Avenue as

an Integrity Officer.  (Pl. Dep. 2:5–6, 223:4.)  Sammarco observed that several offices in the

building had material covering the windows on the doors, or the windows between the offices

and hallways, and contacted Sheriff Eason inquiring about the covered windows.  (Defs. 56.1

¶¶ 56, 58; Pl. 56.1 ¶ 58; Defs. Ex. J, Deposition of Peter Sammarco ("Sammarco Dep.") 63:25–

65:2.)  Sammarco did not believe this was a good business practice.  (Defs. 56.1 ¶¶ 58; Pl. 56.1

¶¶ 56, 58; Sammarco Dep. 63:25–65:2.)  On May 19, 2006, LaRose visited the office at 30-10

Starr Avenue and subsequently sent an email to two Undersheriffs requesting that the opaque

material covering the windows be removed immediately unless there was a work-related

justification for the windows to be covered.  (Defs. 56.1 ¶ 53; Pl. 56.1 ¶ 53; Defs. Ex. I.)

According to Defendants, everyone removed their window coverings.  (Defs. 56.1 ¶ 60).

According to Plaintiff, the other lieutenants all had solid doors and no windows into their offices,

and they continued to close the doors when they needed privacy.  (Pl. 56.1 ¶ 60; Pl. Dep. 64:14–

19.)   Plaintiff removed the cover from her office window, but after Sammarco left the office at

30-10 Starr Avenue in 2007,[5] Plaintiff again covered the window.  (Defs. 56.1 ¶¶ 60, 62; Pl. 56.1

¶¶ 60, 62.)

### b.   2006 EEO complaint and EEOC charge

According to Plaintiff, on May 22, 2006, she called the EEO Officer for the DOF, Annie

Long, to complain about the directive, indicating that because she was the only female lieutenant

in the building, the directive prevented her from enjoying her privacy like the "other bosses."

(Pl. 56.1 ¶ 47; Pl. Ex. B and Defs. Ex. C ("2006 EEOC charge") at 2.)  Plaintiff states that EEO

Officer Long contacted management, although Plaintiff did not know precisely who, and the next

day Long called Plaintiff to discourage her from moving forward with a formal EEO complaint.

(Pl. 56.1 ¶ 47, Pl. Dep. 61:22–62:10, 65:1–19; 2006 EEOC charge at 2.)  Plaintiff contends that

the day after this conversation with the EEO Officer, Plaintiff was assigned additional duties

working in other units.  (Pl. 56.1 ¶ 47.)

Plaintiff filed a charge with the EEOC approximately three months later, on August 22,

2006, alleging race and gender discrimination in connection with the directive to remove the

window coverings, (Defs. 56.1 ¶ 55; Pl. 56.1 ¶ 55; 2006 EEOC charge), and in connection with

---

[5]  Sammarco left 30-10 Starr Avenue approximately eight months to one year after he
began in April or May 2006.  (Def. 56.1 ¶ 61; Pl. 56.1 ¶ 61.)  Sammarco testified that he worked
at 30-10 Starr Avenue for a period of "six, eight months" from when he began in April or May
2006, (Sammarco Dep. 68:13–19), and Plaintiff testified that Sammarco was there for
approximately one year, (Pl. 225:12–17).

being assigned "menial tasks" on May 23, 2006, (2006 EEOC charge at 2). Plaintiff received a right-to-sue letter but decided not to sue at that time. (Pl. Dep. 70:21–71:11.) In the 2006 EEOC charge, Plaintiff noted that three other offices were affected by the directive, two of which opened onto a smaller area with just a small number of staff, and one of which belonged to Sammarco, but because those offices did not open onto a main hallway, the occupants of those offices did not have their privacy interfered with by the directive in the same way her privacy was affected. (2006 EEOC charge.) Plaintiff also noted that immediately after she had a conversation with the EEO officer in the Sheriff's Office, she was asked to take on the duties of another unit, and assigned menial tasks. (*Id*. at 2.)

### c. Performing Undersheriff duties

Plaintiff claims that, in or about November 2007, Plaintiff's direct supervisor, Undersheriff Peter Talamo, retired, and Plaintiff took over some of his responsibilities including generating reports, signing time-sheets for the Firearms and Auto Theft unit, attending meetings and making decisions. (Defs. 56.1 ¶ 136; Pl. 56.1 ¶ 136; Pl. Dep. 144:1–19.) Plaintiff performed these additional duties without a direct supervisor for the approximately seven months it took to find a replacement for Talamo. (Defs. 56.1 ¶ 138; Pl. 56.1 ¶ 137.) The work caused her to stay late "a couple of times like 20 minutes, a half an hour," but she did not request overtime pay for these hours. (Pl. Dep. 146:14–18.) Nor did Plaintiff receive additional compensation for performing these additional duties. (Pl. 56.1 ¶ 137.) Plaintiff was a Level 1 Lieutenant, while individuals with the title of Undersheriff were Level 2 Lieutenants. (Pl. Dep. 145:12–17; Oral Arg. Tr. 43:5–45:14.) Plaintiff made the same as or more than all other Level 1 Lieutenants, but did not make as much as a Level 2 Lieutenant who had the position of Undersheriff. (Pl. Dep. 144:25–145:6.) Plaintiff claims that no other Level 1 lieutenant was subject to the extra

duties of filling in for Undersheriff, and that all the individuals performing the work of an

Undersheriff were making more money than her and were all males.  (Pl. Opp'n Mem. 18–19.)

Plaintiff acknowledges that the position of Undersheriff, which was a "Lieutenant Level 2"

position, was attained by taking the civil service test.  (*Id*. at 145:23–23, 187:10–17.)  Plaintiff

was aware of how civil service worked, and knew that they would not pay her more unless she

was actually promoted to the position of Undersheriff.  (*Id*. 148:17–21.)  Plaintiff had not taken

the civil service exam to apply for the position of Undersheriff.  (*Id*. at 145:16–25, 148:17–21,

149:14–20.)  The Undersheriff position remained open for several months because "they

couldn't decide whether they wanted to use the civil service list or choose somebody of their

liking."  (*Id*. at 145:17–20.)  Plaintiff did not apply for the position.  (Pl. 56.1 ¶ 137; Pl. Dep.

45:21–25.)

> **d. Assignment to Kendra's Unit**

In June 2009, the Cigarette Tax unit was disbanded.  (Defs. 56.1 ¶ 80; Pl. 56.1 ¶ 80; Pl.

Dep. 72:21–73:17.)  Plaintiff was transferred to "Kendra's Unit," which works with citizens with

uncontrolled mental illness, and was moved to a different office at 30-10 Starr Avenue.  (Defs.

56.1 ¶¶ 81–82; Pl. 56.1 ¶¶ 81–82.)  Plaintiff was given the title of "Administrative Lieutenant,"

with the responsibility to perform administrative functions and provide additional supervisory

coverage when the lieutenant with primary responsibility for the unit was not present.  (Defs.

56.1 ¶ 86; Pl. 56.1 ¶ 86.)  Plaintiff claims that the title of administrative lieutenant had never

existed before, and had never been given to any of the male lieutenants.  (Pl. Dep. 82:22–25.)

According to Plaintiff, Kendra's Unit was a "voluntary" unit, and employees were assigned to it

only when they requested the assignment but Plaintiff was assigned to the unit even though she

had not requested assignment to this unit.  (Pl. 56.1 ¶¶ 81, 83; Pl. Dep. 77:11–20.)  A document

listing all the transfers within the Sheriff's Office over a 3-year period indicates that Plaintiff requested a transfer to Kendra's Unit. (Pl. Ex. K at 3.) Plaintiff claims that this document is "inaccurate." (Pl. Dep. 77:13–16.) Plaintiff asserts that the transfer to Kendra's Unit was "punishment" because the work was "just a repetition of the same thing of picking up mentally ill people." (Pl. Dep. 89:2–18.)

### e. Transfers

When Cigarette Tax unit was disbanded in June 2009, approximately one-quarter of the staff — 25 deputies and lieutenants — in the Sheriff's Office were transferred. (Defs. 56.1 ¶ 80; Pl. 56.1 ¶ 80; Pl. Dep. 72:21–73:17.) Plaintiff was not aware that the Cigarette Tax unit would be disbanded and that the transfers would be taking place, and did not have an opportunity to request to be transferred to a unit closer to her home. (Pl. 56.1 ¶¶ 79–81; Pl. Dep. 81:2–16.) Plaintiff had previously informed her supervisor, Talamo, that she would prefer to work out of the Queens Law Enforcement Bureau, located at the western edge of Queens, closer to her home, (Pl. Dep. 87:21–88:6), but Chief Talamo was no longer with the Sheriff's Department at the time of the June 2009 Transfers, (*Id.* at 88:7–8.) Plaintiff did not request to be transferred to the Queens location after she learned about the transfers in June 2009. (*Id.* at 88:9–19.) Plaintiff claims that as a result of the June 2009 transfers, several other lieutenants, all white males, transferred to, or remained in, a unit located in the borough closest to their home. (Defs. 56.1 ¶¶ 87, 91–94 (citing Pl. Dep.); Pl. 56.1 ¶¶ 91, 94 (citing Pl. Ex. K, Sherriff's Office Transfers from Jan. 1, 2008 – Oct. 10, 2010).) Plaintiff did not know whether these lieutenants had requested the transfers. In January 2011, Plaintiff requested and was granted a transfer to the Queens Law Enforcement Bureau. (Defs. 56.1 ¶ 95; Pl. 56.1 ¶ 95.)

### f. Discipline and scrutiny

#### i. September 2009 meeting

According to Plaintiff, in September 2009 several incidents took place illustrating a pattern of retaliatory disciplinary actions taken against her. On September 4, 2009, a meeting took place between Kendra's Unit personnel, Sheriff's Office leadership, and personnel from the New York City Department of Health and Mental Hygiene ("DOHMH"), which provides all of the funding for the Kendra's Unit operations. (Defs. 56.1 ¶¶ 96, 98–99; Pl. 56.1 ¶¶ 96, 98–99.) During the meeting, Plaintiff became involved in a verbal "back and forth" with Dr. Medina, an employee of DOHMH, during which Plaintiff raised her voice. (Defs. 56.1 ¶¶ 101–103; Pl. 56.1 ¶¶ 101–103.) Sammarco, who was taking notes at the meeting, (Sammarco Dep. 40:22–41:7), included a summary of the exchange in the meeting minutes, (Pl. Ex. M ("September 4, 2009 Meeting Minutes").) Sammarco's characterization of the exchange made Plaintiff look bad, without providing the full context of the exchange and without indicating that Dr. Medina shared fault. (Pl. 56.1 ¶ 103.) Plaintiff asserts that Sammarco did this in retaliation for Plaintiff's previous complaints of discrimination and harassment against Sammarco. (Pl. 56.1 ¶ 103.)

At that same meeting, after the staff from DOHMH left, Plaintiff was asked to fill in on field duty to replace a sergeant who had been injured, which Plaintiff declined to do. (Defs. 56.1 ¶¶ 104–105, 108; Pl. 56.1 ¶¶ 104–105, 108; Pl. Dep. 97:7–10.) Plaintiff was "taken aback" and "shocked" by the request, and responded that she had been at the Sheriff's Office a long time, she was 50 years old, and she did not want to go into the field.[6] (Defs. 56.1 ¶ 105, Pl. 56.1 ¶

---

[6] According to Defendants' records, another lieutenant present at that meeting appears to have also made comments indicating that Plaintiff should not be required to fill in for a sergeant. (*See* Def. Ex. N ("Memorandum to Undersheriff Doyle dated Sept. 30, 2009" (counseling memorandum from First Deputy Pu-Folkes to Undersheriff Doyle documenting that, during the September 4, 2009 meeting, two of Doyle's subordinates, Plaintiff and Lieutenant Zane, had expressed a "strong view that safety concerns justify making field assignments based on age as a

105; Pl. Dep. 94:7–11.)  According to Plaintiff, there were plenty of sergeants available who could have filled in for the injured sergeant.  (Pl. 56.1 ¶¶ 105–106; Pl. Dep. 94:20–95:1.) Plaintiff and First Deputy Pu-Folkes became involved in a "testy" verbal exchange in which Plaintiff raised her voice at Pu-Folkes.  (Defs. 56.1 ¶ 108; Pl. Dep. 97:11–12.)  Plaintiff claims the meeting minutes inaccurately indicated that Plaintiff raised her voice at the Sheriff, rather than only at Pu-Folkes.  (Pl. Dep. 97:15–18.)  Plaintiff eventually participated in field duty two or three times, when another lieutenant, Lieutenant Zane, who normally was in the field with Kendra's Unit, was not available.[7]  (*Id.* at 94:20–25, 99:13–24; Pl. 56.1 ¶ 109.)

### ii. Jewelry complaint

Immediately after the September 4, 2009 meeting, Pu-Folkes had a conversation with Plaintiff's supervisor, Undersheriff Doyle, regarding Plaintiff wearing jewelry while in uniform during the meeting, in violation of the Sheriff's Office code.  (Sammarco Dep. 41:12–42:20; Defs. Ex. L, Deposition of Oliver Pu-Folkes, 19:6–22:21.)  Later that day, Plaintiff's supervisor, Undersheriff Doyle, had a discussion with Plaintiff about wearing jewelry while in uniform. (Defs. 56.1 ¶ 114; Pl. 56.1 ¶ 114.)  Doyle memorialized that conversation in a memorandum addressed to LaRose on September 18, 2009.  (Defs. Ex. M.)  Plaintiff contends that she also received a counseling memorandum about wearing jewelry, however, this memorandum is not in the record, and Plaintiff could not say whether it had ever been placed in her personnel file.  (Pl. 56.1 ¶¶ 113, 118; Pl. Dep. 114:16–21.)  Plaintiff further contends that, although other male officers wear jewelry, they were only verbally reprimanded for their first infraction, while

qualifier," and that Doyle had missed an opportunity to enforce the EEO policies and procedures of the Sheriff's Office by not correcting these misstatements)).)

[7]  Approximately a month later, on October 20, 2009, LaRose sent an email to the Undersheriffs requiring all lieutenants to perform 1.5 hours of field work per week, "as was discussed at our staff meeting on September 24th."  (Pl. Ex. P, Email dated Oct. 20, 2009.)

Plaintiff received a counseling memorandum for her first infraction.[8]  (Pl. 56.1 ¶ 113.)  On

September 10, 2009, Supervisor LaRose sent an email to Doyle requesting him to "[p]lease

ensure that you include Lt. Bowen's uniform infractions on September 4th" in a quarterly report.

(Pl. Ex. R, Email dated Sept. 10, 2009.)

### iii.  Counseling memorandum regarding statements about age

On September 8, 2009, Doyle had a discussion with Plaintiff about Sheriff's Office EEO

policy, informing  Plaintiff that her reference to her age at the September 4, 2009 meeting

mistakenly suggested that age could be a qualifier for job assignments.  (Defs. 56.1 ¶ 114; Pl.

56.1 ¶ 114; Defs. Ex. M.)  Plaintiff received a related counseling memorandum from Doyle on

Oct. 13, 2009.  (Defs. 56.1 ¶ 116; Defs. Ex. O ("Counseling Memorandum dated October 13,

2009"); Pl. Dep. 114:21–23.)  On September 30, 2009 Doyle received a counseling

memorandum from First Deputy Pu-Folkes noting that, during the September 4, 2009 meeting,

two of Doyle's subordinates, Plaintiff and Lieutenant Zane, had expressed a "strong view that

safety concerns justify making field assignments based on age as a qualifier," and that Doyle had

missed an opportunity to enforce the EEO policies and procedures of the Sheriff's Office by not

correcting these misstatements.  (Defs. 56.1 ¶ 115; Pl. 56.1 ¶ 115; Defs. Ex. N ("Memorandum to

Undersheriff Doyle dated Sept. 30, 2009").)

### iv.  Directive to wear full uniform

Plaintiff claims that in September 2009 she was ordered to wear her full uniform at all

times, although it was the practice in the Sheriff's Office that officers who were not in the field

"were allowed to be in civ[ilian clothes], and I was allowed to be" in civilian clothes.  (Pl.

---

[8]  For example, Plaintiff testified that Sergeant Narvez was in the habit of wearing a
heavy gold bracelet, and "I think one time I heard for him to take it off, but then, you know, I
saw it with him afterwards," and testified about "various men who had pierced ears or a pierced
ear and they were just told to just remove the earring."  (Pl. Dep. 109:14–110:3.)

Dep. 130:19–131:12.)  Plaintiff claims that a "couple of weeks" after she was individually

directed to wear her full uniform at all times, Defendants issued a directive requiring the rest of

her unit to do the same.  (Pl. Dep. 137:7–24, 138:16–21.)  On September 18, 2009 Doyle sent an

email to Plaintiff and three other Lieutenants advising that, effective September 23, 2009, all

unformed personnel were required to be in uniform five minutes after the start of their tour.  (Pl.

Ex. T, Email dated Sept. 18, 2009.)  Shortly after that, another directive went out ordering all

other units to be in uniform at all times.  (Pl. Dep. 131:2–4, 134:20–135:6, 137:7–22.)

### g.    2009 EEO complaint

On September 11, 2009, Plaintiff filed an EEO complaint alleging discrimination on the

basis of age, gender, color, race and being a union delegate, and retaliation for filing a complaint,

based on the actions of Eason, Pu-Folkes, and LaRose in asking her to perform the tasks of a

sergeant.  (Defs. 56.1 ¶ 120, Pl. 56.1 ¶ 120; Defs. Ex. E and Pl. Ex. S.)  Plaintiff wrote that

"[s]ince I stated to management I didn't want to do the job of a Sgt. I have been harassed by

memos written to my supervisor about me from management causing me undue distress."  (2009

EEO Complaint.)

### h.    2010 EEOC charge

Plaintiff filed a charge with the EEOC on or about January 7, 2010, alleging race and

gender discrimination, retaliation and a hostile work environment, (Defs. 56.1 ¶ 50, Pl. 56.1

¶ 50), concerning an assortment of actions by Defendants, including (1) being subject to unfair

discipline, (2) not being awarded discretionary pay, (3) being denied the opportunity for

overtime pay, (4) not being transferred to an office closer to her home, (5) being subjected to

excessive monitoring and criticism, (6) being "subjected to a hostile work environment whereby

my authority as a Lieutenants is undermined, I am given menial tasks, subject to stalking," and (7) not receiving awards, (Defs. Ex. F ("2010 EEOC charge") at 2).[9]

### i. Scrutiny of Plaintiff's supervisor

Beginning in January 2010, Plaintiff began an eleven-month external course to train as a professional chef, and her supervisor allowed her to change the hours of her shift to 4:00 am to 12:00 pm to accommodate her course. (Defs. 56.1 ¶¶ 39–40; Pl. 56.1 ¶¶ 39–40.) Four months into the start of her culinary program, Chief of Operations LaRose learned about Plaintiff's change in hours and told Plaintiff's supervisor that such a change of hours was "not acceptable." (Pl. 56.1 ¶ 43; Pl. Ex. D and Defs. Ex. D, LaRose Dep. 26:10–30:24.) Plaintiff contends that this additional scrutiny and LaRose's attempt to have her hours changed was inconsistent with the practice of the Sheriff's Office of allowing Undersheriffs to give their lieutenants their preferred shift hours, and of permitting other, male, lieutenants to work their preferred hours to accommodate child care, a second job, or other needs. (Pl. 56.1 ¶ 45; Pl. Dep. 23:8–24:23.) Plaintiff continued on her 4:00 a.m. to 12:00 p.m. hours until her course was completed in November 2010, and then returned to her regular shift hours. (Defs. 56.1 ¶ 44; Pl. 56.1 ¶ 44.)

### j. 2010 window covering incident

In August or September 2010, Sammarco returned to the office at 30-10 Starr Avenue as Chief of Operations, and twice ordered Plaintiff to remove the covering from her window. (Defs. 56.1 ¶¶ 64–65; Pl. 56.1 ¶ 65.) On December 8, 2010, Sammarco emailed Plaintiff's supervisor, Doyle, noting that Plaintiff still had not removed the cover from her window and informing Doyle that if the cover was not removed by the end of the following day, Sammarco would seek charges against Plaintiff for disobeying an order. (Defs. 56.1 ¶ 66; Defs. Ex. K.)

---

[9] Plaintiff received a right-to-sue letter on September 22, 2010, and subsequently brought the instant action. (*See* Compl. Ex. A.)

According to Sammarco, Plaintiff contacted Undersheriff Fucito to complain about the directive. (Sammarco Dep. 66:9–11.)  On December 16, 2010, Fucito sent an email to the entire staff directing any staff with an enclosed office to keep their office door open, and permitting those who "are changing clothes or conducting sensitive agency business" to close the door or use other methods, such as window shades, to ensure privacy during that period of time.  (Defs. 56.1 ¶ 72; Pl. 56.1 ¶ 72; Defs. Ex. K and Pl. Ex. I.)  Plaintiff removed the cover from her window at an unspecified time.  (Defs. 56.1 ¶ 67; Pl. 56.1 ¶ 67.)

      **k.**    **Sexual harassment allegations**

According to Plaintiff, in 2006 Sammarco would walk past her office as many as 20 times per day, and "every time he went past my door, he had to look in.  You know, like look. And then keep walking."  (Pl. Dep. 225:5–11.)  Plaintiff also claims that Sammarco would "stare" at her when she walked down a hallway, and would walk behind her in a "menacing" manner, (*Id.* at 226:2; Defs. 56.1 ¶ 73 (citing Pl. Dep. 225:4–226:19, 227:8–228:8); Pl. 56.1 ¶ 73), and that he "had a habit of staring at black women" and three other women in the office had also experienced Sammarco "staring" at them.  (Pl. Dep. 232:5–234:14.)  "Sammarco [also] had a habit of being present at places where such presence was neither needed nor justified, as Sergeant Jefferson Rodriguez from the Warrants Unit complained about Peter Sammarco being present between sergeants for no reason during morning assignments . . . . Hence, not only Plaintiff, but several officers had problems with hostility and discomfort that Sammarco created at the Sheriff's Office."  (Pl. 56.1 ¶ 59.)  According to Defendants, Sammarco would walk through the building to review the work of personnel, where they are working and what they are doing.  (Defs. 56.1 ¶ 74 (citing Sammarco Dep. 55:17–56:12).)

In November 2010, both Plaintiff and Sammarco were in the garage of the office at 30-10

Starr Avenue.  (Defs. 56.1 ¶ 75; Pl. 56.1 ¶ 75.)  According to Plaintiff, Sammarco followed

Plaintiff into the garage, and when she turned around, he stood "glaring" at her.  (Pl. Dep.

227:21–22, 228:15–20.)  Sammarco continued to stand and glare at Plaintiff while she got into

her truck and drove through the garage until she exited the garage.  (Defs. 56.1 ¶ 75; Pl. 56.1 ¶

75; Pl. Dep. 228:15–229:6.)  According to Sammarco, he was looking for the deputy who was in

charge of the fleet of vehicles, and when he could not find the deputy in the deputy's office near

the garage, Sammarco entered the garage, saw Plaintiff's truck driving out, and looked to see if

the driver was the deputy he was looking for.  (Defs. 56.1 ¶ 76 (citing Sammarco Dep. 71:6–

72:15).)

### l. 2010 EEO complaint

On December 17, 2010, Plaintiff filed an internal EEO complaint alleging discrimination

on the basis of color, gender and race, and sexual harassment and retaliation, based on

Sammarco's directive to remove the window covering, his practice of "glaring and peeking

through windows at myself and other women," and the incident in the garage.  (Defs. 56.1 ¶ 68;

Pl. 56.1 ¶ 68; Defs. Ex. H ("December 2010 EEO Complaint").)[10]

### m. Evaluations

Plaintiff received an evaluation of "Good," lower than "Superior" or "Outstanding" for

each of the three years between 2002 and 2005.  (Defs. 56.1 ¶¶ 145–147; Pl. 56.1 ¶¶ 145–147.)

For the 2005–06, and 2006–07 years, Plaintiff received a rating of "Superior," just below

"Outstanding."  (Defs. 56.1 ¶¶ 148–150; Pl. 56.1 ¶¶ 148–150.)  For the 2007–08 year, when

Plaintiff was without a direct supervisor for seven months, Plaintiff's evaluation was conducted

by LaRose.  (Defs. 56.1 ¶ 139; Pl. 56.1 ¶ 139.)  Plaintiff contends that LaRose, who was

---

[10]  The parties do not address what, if anything, resulted from this EEO complaint.

stationed in Manhattan, infrequently interacted with Plaintiff, had little basis to formulate an evaluation, and simply copied the prior year's evaluation by rating Plaintiff as "Superior." (Pl. 56.1 ¶ 151; Pl. Dep. 152:18–20.) Plaintiff felt that the rating of "Superior" did not adequately reflect the additional work she had been doing while filling in as an Undersheriff, and that it was not appropriate for LaRose, who had only seen her three times that year, to prepare the evaluation. (Pl. Dep. 152:18–20.) Plaintiff refused to sign the evaluation, noting that she had not had a supervisor, and that there was no adequate basis on which the evaluation could be based. (Defs. 56.1 ¶ 151; Pl. 56.1 ¶ 151; Defs. Ex. R, Email from Plaintiff dated July 17, 2009.) The following year, 2008–2009, Plaintiff's direct supervisor, Undersheriff Schor, did not complete an evaluation for Plaintiff. (Defs. 56.1 ¶ 152; Pl. 56.1 ¶ 152.) Plaintiff did not ask for one because none of the other lieutenants had to ask for their evaluations, rather, they were given their evaluation automatically. (Pl. Dep. 254:8–23.) For the 2009–10 year, Plaintiff received an evaluation with a final rating of "Superior." (Defs. 56.1 ¶ 153; Pl. 56.1 ¶ 153.) The evaluation included an addendum dated August 30, 2010 from LaRose documenting that LaRose had requested Doyle to incorporate three issues into Plaintiff's evaluation and, because Doyle refused to do so, LaRose was including the issues himself in his capacity as reviewer of the performance evaluations. (Pl. Ex. W, Plaintiff 2009–2010 Evaluation, at 4.) The three issues were (1) Plaintiff misstating EEO laws at the meeting on September 4, 2009 when she commented that "she could not be required to perform field work" since she was over 50 years old, (2) Plaintiff being "insubordinate" by raising her voice to Sheriff Eason at the same meeting, and (3) Plaintiff wearing jewelry at that meeting which was not in compliance with uniform requirements. (*Id.*)

n. **Overtime**

Overtime assignments in the Sheriff's Office required pre-approval, and at times offers to

work overtime were made by email to all staff or to all lieutenants in the Sheriff's Office. (Pl. Dep. 201:19, 202:17–22.) According to Plaintiff, even when such an email was circulated, certain individuals had already been "pre-picked" to be offered the overtime assignments, and Plaintiff was never one of those individuals. (Pl. Dep. 203:25–204:1.) Plaintiff could not offer a specific time when such a pre-selection had taken place, or likely taken place.[11] (Pl. Dep. 204: 3.) Plaintiff contends that one of the reasons she was not "pre-picked" in this manner was because she did not have a supervisor for seven months between November 2007 and May 2008. (Pl. 56.1 ¶ 174.) While overtime assignments in the Sheriff's Office decreased by 74% between 2008 and 2009, (Defs. 56.1 ¶ 178; Pl. 56.1 ¶ 178), Plaintiff claims that other staff in the Sheriff's Office who were junior to her continued to receive overtime assignments, while she did not, but could not provide any specific information about anyone who received overtime,[12] (Pl. 56.1 ¶ 178; Pl. Dep. 208:8–9).

In September 2009 Doyle requested overtime for the entire Kendra's Unit but LaRose denied the request. (Pl. 56.1 ¶ 175 (citing Pl. Ex. Y, Emails dated Sept. 21, 2009 re: Overtime).) Plaintiff, like all officers in the Warrants Unit, received overtime in June 2010 at a time when the Warrants Unit was trying to use up its budget surplus prior to the end of the fiscal year. (Pl. 56.1 ¶ 177 (citing Pl. Dep. 205:12–19).)

---

[11] Although Plaintiff cited the United Nations Security Council detail from September 2009, (Def. 56.1 ¶ 173), claiming that lieutenants junior to her received overtime assignments, and stating that she "would have done it," she did not dispute that an email was sent to all sheriffs informing them about the overtime opportunity, instead stating "It might not have been the UN detail that I wasn't notified about." (Pl. Dep. 202:17–203:24.)

[12] Plaintiff contends that "some people were getting overtime. It was just not I." (Pl. Dep. 208:8–9.) When asked who was getting overtime, Plaintiff responded: "There were other lieutenants — I can't pinpoint to tell you off the top of [my] head now what lieutenants were working when. I'm sure they have a record of who was getting overtime."

### o. Union activity

Plaintiff was on the board of her union and active as a lieutenant's representative for the Sheriff's Office. (Pl. Dep. 213:7–10.) Sometime in late September or early October 2009, the union published a photograph of Pu-Folkes inappropriately dressed in a uniform that mixed his New York City Police Department attire with his Sheriff's Office regalia while on duty during a detail with the United Nations, giving the incorrect impression that he was a four-star officer with the NYPD. (Pl. Dep. 209:5–211:11.) Shortly after the publication of that photograph, Plaintiff contends that she began to receive additional "attention" in the form of memoranda from LaRose to her immediate supervisor, Doyle, inquiring about Plaintiff's daily activities, how long it took her to complete certain tasks, and why Plaintiff was not involved in other tasks. (Pl. Dep. 212:11–216:3.)

## II. Discussion

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic Sec., L.L.C.*, --- F. App'x ---, ---, 2014 WL 943933, at *1 (2d Cir. Mar. 12, 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65, 2013 WL 3388446, at *4 (2d Cir. 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence

on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The Second Circuit has cautioned that '[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Taddeo v. L.M. Berry & Co.*, 526 F. App'x 121, 122 (2d Cir. 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

### b. 2006 EEOC right-to-sue letter

Defendants argue that the allegations contained in Plaintiff's 2006 EEOC charge, for which she received a right-to-sue letter but did not bring a lawsuit, are barred as she did not file a suit within 90 days of receiving her right-to-sue letter. (Defs. Mem. 5 n.3.) Defendants are correct. Plaintiff's failure to act on the right-to-sue letter she received from the EEOC charge in response to her August 22, 2006 charge of discrimination bars her from now bringing those claims as part of the instant action. A plaintiff must file a lawsuit within 90 days of receiving a right-to-sue letter. 42 U.S.C.A. § 2000e-5(f)(1); *see also Friedman v. Swiss Re Am. Holding Corp.*, 512 F. App'x 94, 95–96 (2d Cir. 2013) ("In order to pursue successfully a Title VII . . . claim in federal court, a plaintiff must file his federal complaint within 90 days of receipt of his right-to-sue notice from the Equal Employment Opportunity Commission . . . ." (citing 42 U.S.C. § 2000e–5(f)(1))); *Dawes v. City Univ. of New York*, 193 F. App'x 59, 60 (2d Cir. 2006) ("A

Title VII claimant must file his complaint not more than 90 days after receipt of a right-to-sue letter from the EEOC." (citing *Cornwell v. Robinson*, 23 F.3d 694, 706 (2d Cir. 1994)); *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525 (2d Cir. 1996) ("In order to be timely, a claim under Title VII . . . must be filed within 90 days of the claimant's receipt of a right-to-sue letter.").

Plaintiff cannot "save" her claims regarding the acts that were the subject of her 2006 EEOC charge, and for which she received a right-to-sue letter, by including them in her 2010 EEOC charge, as a plaintiff may not bring claims "involving exactly the same facts" that comprised an earlier right-to-sue letter on which a plaintiff did not act. *Lo v. Pan Am. World Airways, Inc.*, 787 F.2d 827, 828 (2d Cir. 1986) (per curiam). While Plaintiff's receipt of the first right-to-sue letter in 2006 does not bar her from bringing claims based on Defendants' subsequent conduct, she may not rely on those claims to "revive" the stale 2006 claims on which she chose not to sue. *See Melie v. EVCI/TCI Coll. Admin.*, 374 F. App'x 150, 152 (2d Cir. 2010) (finding that "all of [plaintiff's] discrimination and retaliation claims . . . were time-barred, except for the one claim presented in [plaintiff's] February 27, 2007 Equal Employment Opportunity Commission ("EEOC") charge not previously presented in his September 25, 2006 EEOC charge." (citing *Lo*, 787 F.2d at 828)). Accordingly, Plaintiff's claims brought in connection with these incidents are not considered here.

### c. Failure to exhaust

Plaintiff has failed to exhaust her administrative remedies with regard to events which took place during 2010. Plaintiff filed suit on December 22, 2010, alleging claims primarily based on her January 7, 2010 EEOC charge, for which she received a right-to-sue letter from the EEOC on September 22, 2010. However, Plaintiff's action is also based on conduct that occurred *after* Plaintiff filed her EEOC charge in 2010. The actions that took place subsequent

to Plaintiff filing her January 7, 2010 EEOC charge are: (1) Plaintiff being singled out and targeted to comply with the window directive in 2010, (Defs. 56.1 ¶ 64), (2) the "garage incident" with Sammarco, (Defs. 56.1 ¶¶ 75–76), (3) Plaintiff's supervisor being reprimanded in approximately May 2010 for permitting Plaintiff to change her shift hours to accommodate a culinary arts course, (Pl. 56.1 ¶ 43), and (4) the comments appended to her 2009–2010 evaluation by LaRose in August 2010, (Pl. 56.1 ¶ 154).  Because those events were not the subject of Plaintiff's January 7, 2010 EEOC charge and therefore not covered by the September 22, 2010 right-to-sue letter from the EEOC, Plaintiff failed to exhaust her administrative remedies with respect to claims related to those events.  *See Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) ("Exhaustion of administrative remedies through the EEOC is "an essential element" of the Title VII . . . statutory scheme[] and, as such, a precondition to bringing such claims in federal court."); *Hewitt v. New York City Dep't of Health & Mental Hygiene*, 535 F. App'x 44, 45 (2d Cir. 2013) (affirming district court finding that plaintiff "failed to administratively exhaust her Title VII retaliation claim by failing to include that claim in her administrative complaint"); *Canty v. Wackenhut Corr. Corp.*, 255 F. Supp. 2d 113, 117 (E.D.N.Y. 2003) ("[W]hile the complaint alleges that a grievance was filed with the EEOC, it does not state that Canty obtained a right-to-sue letter. Thus, she has not demonstrated that she has exhausted her administrative remedies.").

Defendants raised Plaintiff's failure to exhaust as an affirmative defense in their Answer, (Docket Entry No. 14 ¶ 108), but they did not move to dismiss those claims based on Plaintiff's failure to exhaust her administrative remedies.  Instead, Defendants addressed the merits of each of the unexhausted claims in their motion for summary judgment.  The Court finds that

Defendants have waived their objection to Plaintiff's failure to exhaust these claims.[13] *See*

*Mathirampuzha v. Potter*, 548 F.3d 70, 79 (2d Cir. 2008) (addressing plaintiff's unexhausted

Title VII claim on the merits where defendants did not raise, as an argument on appeal,

Plaintiff's failure to exhaust this claim through his EEOC filing); *Francis v. City of New York*,

235 F.3d 763, 766 (2d Cir. 2000) (holding that the exhaustion requirement under Title VII is

waivable, and that the defendants' "long delay in attacking the sufficiency of plaintiff's

administrative exhaustion clearly constitutes [such] a waiver"); *Jordan v. Forfeiture Support*

---

[13] In addition, because Plaintiff's claims that accrued in 2010 are "reasonably related" to the claims that were the subject of her January 7, 2010 EEOC charge, Plaintiff can pursue those claims. *See Tanvir v. N.Y.C. Health & Hospitals Corp.*, 480 F. App'x 620, 621 (2d Cir. 2012) ("[A] claim that was not presented to the EEOC may still be pursued where the claim is 'reasonably related' to the claims that were brought before the agency."). A claim is reasonably related if it is (1) a claim where "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made," (2) "a claim alleging retaliation by an employer against an employee for filing an EEOC charge," and (3) "a claim where the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (alteration, citation and internal quotation marks omitted). When assessing whether the conduct complained of would reasonably fall within the scope of the EEOC investigation arising from the charge, "the focus should be on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Williams*, 458 F.3d at 70 (alteration, citation and internal quotation marks omitted). "The central question is whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases." *Id.* (citation and internal quotation marks omitted). "Thus, when a claim is simply a newly articulated cause of action that grows directly out of the factual allegations of the EEOC charge, the claim can be brought in district court." *Agosta v. Suffolk Cnty.*, --- F. Supp. 2d. ---, ---, 2013 WL 5960752, at *5 (E.D.N.Y. Nov. 8, 2013) (citation and internal quotation marks omitted).

Plaintiff's allegations regarding the "garage incident" with Sammarco can be said to be "reasonably related" to Plaintiff's claim in the January 2010 EEOC charge that she was "subject to stalking." Although short and conclusory, this claim in Plaintiff's 2010 EEOC charge is sufficient to have permitted the EEOC to investigate and to have put Defendants on notice of Sammarco's allegedly sexually harassing conduct in 2010. Plaintiff's remaining claims that arose in 2010 — that she was targeted for discipline in connection with having her window covered in 2010, that her supervisor was reprimanded for permitting her to change her shift, and that in August 2010 she received negative comments appended to her evaluation — are arguably reasonably related to Plaintiff's claims in the 2010 EEOC charge that Defendant's excessive monitoring and scrutiny comprised retaliation and a hostile work environment.

*Associates*, 928 F. Supp. 2d 588, 603 (E.D.N.Y. 2013) ("[I]t is well established that 'filing a timely charge of discrimination with the EEOC is . . . a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.'" (quoting *Francis*, 235 F.3d at 767)); *Wiercinski v. Mangia 57, Inc.*, No. 09-CV-4413, 2012 WL 2319142, at *5 (E.D.N.Y. June 19, 2012) ("[B]ecause exhaustion is not a jurisdictional requirement, but instead simply a precondition to bringing a Title VII action, it can be waived by the parties or the court." (citing *Francis,* 235 F.3d at 769)).

### d. Statutes of limitations

#### i. Title VII claims

Plaintiff is time-barred from pursuing all Title VII claims concerning conduct that took place prior to March 13, 2009. A plaintiff seeking to bring claims pursuant to Title VII must file a complaint with the EEOC or equivalent state agency within 300 days of the challenged conduct. 42 U.S.C. § 2000e-5(e)(1); *see also Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 125–26 (2d Cir. 2010) ("[I]n states such as New York that have an agency with the authority to address charges of discriminatory employment practices, the statute of limitations for filing a charge of discrimination with the Equal Employment Opportunity Commission is 300 days." (alteration, citation and internal quotation marks omitted)). Plaintiff filed her EEOC claim on January 7, 2010. (Compl. ¶ 8 and Ex. A; Defs. Mem. 5.) Therefore, all Title VII claims that are based on conduct that occurred before March 13, 2009, 300 days prior to January 7, 2010, are time-barred.

At oral argument counsel for Plaintiff argued that the Court should consider incidents that took place prior to March 13, 2009, that were part of Plaintiff's hostile work environment and discrimination claims under the "continuing violation" exception to the 300-day limitations

period.  (Oral Arg. Tr. 12:16–23.)

The continuing violation exception to the limitations period for Title VII complaints permits courts to consider "'claims that the discriminatory acts were part of a continuing policy and practice of prohibited discrimination,' where 'one act of discrimination in furtherance of the ongoing policy occurred within the limitations period.'"  *Lugo v. City of New York*, 518 F. App'x 28, 29 (2d Cir. 2013) (quoting *Valtchev v. City of New York*, 400 F. App'x. 586, 588 (2d Cir. 2010) and *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004)).  Under this exception, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 155–56 (2d Cir. 2012) (citations and internal quotation marks omitted).

Because "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'" the entire time period of the alleged hostile environment "may be considered by a court for the purposes of determining liability" if "an act contributing to the claim occurs within the filing period."  *Nat'l R.R. Passenger Corp. v. Morgan* ("*Morgan*"), 536 U.S. 101, 117 (2002); *see also McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) (stating that, because hostile work environment claims occur "over a series of days or perhaps years," the court may consider "the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, . . . for the purposes of assessing liability" (quoting *Morgan*, 536 U.S. at 105)); *Caravantes v. 53rd St. Partners, LLC*, No. 09-CV-7821, 2012 WL 96474, at *7 (S.D.N.Y. Jan. 12, 2012) ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one

'unlawful employment practice'. . . . Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." (quoting *Morgan*, 536 U.S. at 117)).  Thus, in hostile work environment cases where there is a continuing violation claim, "if any act falls within the statutory time period," the Court must "determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice."  *McGullam*, 609 F.3d at 76 (internal quotation marks omitted) (quoting *Morgan*, 536 U.S. at 120); *see also Raneri v. McCarey*, 712 F. Supp. 2d 271, 281 (S.D.N.Y. 2010) ("To defeat the statute of limitations by applying the continuing violation theory, the evidence must show that such a hostile environment was created prior to, and continued into, the [statutory time period].").

However, the continuing violations doctrine does not apply to discrete acts of discrimination, 'even if they are related to acts alleged in timely filed charges.'"  *Ugactz v. United Parcel Serv., Inc.*, No. 10-CV-1247, 2013 WL 1232355, at *5 (E.D.N.Y. Mar. 26, 2013) (quoting *Morgan*, 536 U.S. at 102).  "[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation."  *Valtchev*, 400 F. App'x at 588–89; *see also Emmons v. City Univ. of New York*, 715 F. Supp. 2d 394, 412 (E.D.N.Y. 2010) ("The continuing violation doctrine only 'allow[s] the inclusion of action whose discriminatory character was not apparent at the time they occurred' and 'is not intended to allow employees a second chance to bring stale claims once the statute of limitations has passed.'" (quoting *Warren v. N. Shore Univ. Hosp. at Forest Hills*, No. 03-CV-0019, 2006 WL 2844259, at *5 (E.D.N.Y. Sept. 29, 2006), *aff'd*, 268 F. App'x 95 (2d Cir. 2008))).  Actions that are "discrete" and "easy to identify," such as "termination, failure to promote, denial of transfer, or refusal to hire . . . constitute[] a separate actionable 'unlawful

employment practice,'" and cannot form the basis of a continuous and ongoing discriminatory practice that entitles a plaintiff to the continuing violation exception. *See Morgan*, 536 U.S. at 114. These prior acts may, however, be considered "as background evidence in support of a timely claim." *Id.* at 113; *see also Coger v. Connecticut Dep't of Pub. Safety*, 143 F. App'x 372, 374 (2d Cir. 2005) ("[W]e agree that *National R.R. Passenger Corp. v. Morgan*, requires the consideration of facts, related to claims now untimely, as background to timely claims.").

Plaintiff's hostile work environment claims include a claim of sexual harassment against Sammarco as well as a claim that she "has been subjected to a hostile environment whereby her authority as a Lieutenant is undermined and she is given menial tasks . . . ."[14] (Compl. ¶ 22; 2010 EEOC charge at 2.)

As to the sexual harassment claim against Sammarco, Plaintiff argues that "Plaintiff's claim[] with regard to [the] window-covering directive is not barred, because although the issues arose in 2006, the discrimination occurred in 2010 as well, after Peter Sammarco came back to work in the same building as Plaintiff." (Pl. Opp'n Mem. 8.) Contrary to Plaintiff's argument, Sammarco's acts of sexual harassment that took place in 2006 — namely, Sammarco's leering and staring at her and passing by her office 20 times per day — cannot be considered part of the "continuing" hostile work environment that Sammarco created when he returned to Plaintiff's office more than three years later. Sammarco was moved from his position at the office located at 30-10 Starr Avenue in mid-2007 and had little to no contact with Plaintiff until 2010. Plaintiff does not allege that any of the other individual Defendants were responsible for any sexual harassment during the three-year interval. Plaintiff cannot show that the hostile work

---

[14] At oral argument counsel for Plaintiff referred to Plaintiff's claims as a hostile work environment claim based on the creation of a demeaning workplace environment, and a sexual harassment claim. (Oral Arg. Tr. 70:15–21, 79:24–80:2.)

environment allegedly caused by Sammarco's sexual harassment in 2006 was "ongoing" when there was undisputedly a three-year period where no harassing acts were being committed. *See Fitzgerald v. Henderson*, 251 F.3d 345, 364 (2d Cir. 2001) ("Not every sexual harassment claim will lend itself to a continuing violation theory"). The Second Circuit has rejected attempts to allege two "phases" of sexual harassment, where a first phase of harassment by a particular defendant ended at a discrete point in time, and a second phase by that same defendant began two and a half years later, where the abuse was "qualitatively different," with no allegations of harassing conduct in between. *Id.*; *see also McGullam*, 609 F.3d at 78 (finding that one-year interval between allegedly harassing incidents, "render[ed] less plausible the notion that the [incidents were] of a piece," and declining to apply the continuing violation theory); *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 727 (7th Cir. 2004) (finding that a three-year gap between allegedly hostile acts precluded the application of continuing violation theory, noting that "the concept of *cumulation* suggests a critical limiting principle. Acts so discrete in time or circumstances that they do not reinforce each other cannot reasonably be linked together into a single chain, a single course of conduct, to defeat the statute of limitations." (citation and alteration omitted)).

Although Sammarco's actions in 2010 may have been very similar to his actions in 2006, that similarity alone is insufficient to render continuous what is essentially two separate instances of alleged harassment separated by more than three years. His actions are precisely the type of "discrete discriminatory acts" that "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113.

In addition, to the extent that Plaintiff is relying on the incidents that arose in 2006 with respect to the window-covering directive that were a part of her 2006 EEOC charge as part of her

claim of sexual harassment, they are barred from consideration by the Court because of Plaintiff's failure to sue within 90 days of receiving a right-to-sue letter in connection with those claims. Plaintiff argues, without citation to any legal authority, that notwithstanding her failure to act on the 2006 right-to-sue letter, the continuing violation theory permits the Court to consider Sammarco's 2006 actions as part of the continuing hostile work environment he created through 2010.

Whether the continuing violation theory can revive claims that are otherwise time-barred by a plaintiff's failure to act on a right-to-sue letter has not been decided by the Second Circuit. However, the First, Sixth, Seventh and Tenth Circuits as well as several district courts have found that a plaintiff may not rely on the continuing violation theory to revive time-barred claims. *See Loubriel v. Fondo del Seguro del Estado*, 694 F.3d 139, 144 (1st Cir. 2012) ("the existence of a continuing violation does not relax the requirement that a plaintiff file her judicial action within 90 days of the receipt of the EEOC's right-to-sue notice"); *Austion v. City of Clarksville*, 244 F. App'x 639, 648 (6th Cir. 2007) ("The continuing violation doctrine . . . does not relieve a plaintiff of the need to file an action within 90 days of receiving the right-to-sue letter."); *Gibbs v. Gen. Motors Corp.*, 104 F. App'x 580, 582 (7th Cir. 2004) (finding that plaintiff "cannot avail herself of the continuing-violation doctrine because she obviously believed that the time-barred acts were discriminatory when she filed EEOC charges in early 2001"); *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 461 (6th Cir. 2001) ("The continuing violation doctrine . . . does not relieve a plaintiff of the need to file an action within 90 days of receiving the right-to-sue letter."); *Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 926 F.2d 959, 962 (10th Cir. 1991) ("the continuing violation theory does not eliminate the requirement that a plaintiff file a judicial action within ninety days of receipt of notice of the right-to-sue"),

*abrogated on other grounds as recognized by Keeler v. Cereal Food Processors*, 250 F. App'x 857, 860 (10th Cir. 2007); *Woods v. Lancaster Indep. Sch. Dist.*, 834 F. Supp. 2d 512, 517 (N.D. Tex. 2011) ("The purpose of the continuing violations doctrine is to ensure claims that are "composed of a series of separate acts that collectively constitute one 'unlawful employment practice' " are actionable. Here, the EEOC's right-to-sue letter informed Woods that her claims were actionable [and] . . . she failed to act.  Accordingly, the Court finds no reason to extend the doctrine to accommodate this circumstance." (citing *Morgan*, 536 U.S. at 117)); *Felix v. City & Cnty. of Denver*, 729 F. Supp. 2d 1243, 1251 (D. Colo. 2010)  invocation of the "continuing violation" doctrine does not excuse an employee's failure to commence suit within 90 days of receiving notice of the right to sue from the EEOC."), *aff'd*, 450 F. App'x 702 (10th Cir. 2011). The Court agrees with the decisions of these courts and concludes that Plaintiff's continuing violation claim cannot revive her otherwise barred claim where she opted not to act within 90 days of her 2006 EEOC right-to-sue letter.

Plaintiff's second hostile work environment claim — that Defendants created a demeaning work environment  — as pleaded and argued, is comprised solely of incidents that occurred in 2009.  (*See* Compl. ¶¶ 26–29; 2010 EEOC charge at 4 (describing events during and subsequent to September 2009 under heading "Hostile Work Environment and Retaliation); Pl. Opp'n Mem. 20–21; Tr. 79:24–81:8.)  Accordingly, Plaintiff does not need to rely on the continuing violation theory to permit the Court to address the full breadth of her "demeaning work environment" hostile work environment claim.[15]

---

[15]  To the extent that both parties at times referenced incidents that took place prior to 2009 as "menial" or "demeaning," the Court will assume that Plaintiff's demeaning hostile work environment claim includes actions by Defendants that took place prior to 2009.  Under the continuing violation theory, these actions may be considered as part of one continuing policy of

The remainder of Plaintiff's claims, including discrimination and retaliation, are comprised of discrete acts by Defendants that are not entitled to the continuing violation exception. *See, e.g.*, *Valtchev*, 400 F. App'x at 588–89 (continuing violation exception did not apply to discrete acts of defendants in denying a plaintiff promotions and subjecting him to unfair discipline); *Oyelola v. Hartford Fin. Servs. Grp., Inc.*, No. 12-CV-01685, 2014 WL 496880, at *9 (D. Conn. Feb. 5, 2014) ("Oyelola's allegations of being under-compensated, demoted, retaliated against, forced to work excessive hours, and denied benefits all involve discrete acts of discrimination" and therefore did not fall within the continuing violation exception); *Pietri v. N.Y.S. Office of Court Admin.*, 936 F. Supp. 2d 120, 134 (E.D.N.Y. 2013) (denial of promotions, being subjected to disparate discipline and denial of transfer opportunities "are all discrete acts of discrimination and each incident 'constitutes a separate actionable unlawful employment practice'" (citing *Morgan*, 536 U.S. at 114, 122) (additional internal quotation marks omitted)). The Court will consider these acts as background information providing context for Plaintiff's claims. *See Davidson v. LaGrange Fire Dist.*, 523 F. App'x 838, 839 (2d Cir. 2013) ("Many of the specific discriminatory acts alleged fall outside of the 300–day statute of limitations. We consider these acts only as 'background evidence' in evaluating the merits of Davidson's discrimination claims." (citations omitted)).

### ii.     The NYSHRL and NYCHRL claims

Under the NYSHRL and the NYCHRL, the statute of limitations is three years. *See* N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8–502(d); *see also Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 248–49 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013). The limitations period is tolled during the pendency of a complaint before an administrative body.

---

creating a hostile work environment for Plaintiff. However, as discussed *supra*, claims that were the subject of Plaintiff's 2006 EEOC charge are barred from consideration except as background.

*Ugactz*, 2013 WL 1232355, at *6; *see also DeNigris v. N.Y.C. Health & Hosps. Corp.*, 861 F. Supp. 2d 185, 192 (S.D.N.Y. 2012) ("Claims brought under the NYSHRL and NYCHRL are subject to a three-year statute of limitations, which is tolled for the period between the filing of an EEOC charge and the issuance by the EEOC of a right-to-sue letter."); *Wilson v. N.Y.C. Police Dep't*, No. 09-CV-2632, 2011 WL 1215735, at *4 (S.D.N.Y. Mar. 25, 2011) ("Courts in this circuit have held that the statute of limitations applicable to claims under NYCHRL and the NYSHRL is tolled during the period in which the complaint is filed with the EEOC."); *Butler v. N.Y. Health & Racquet Club*, 768 F. Supp. 2d 516, 536 (S.D.N.Y. 2011) (filing a complaint with the EEOC was sufficient to toll the statute of limitations on the state claims).

Plaintiff filed her Complaint in this case on December 22, 2010. The underlying EEOC charge was pending with the EEOC between January 7, 2010, and November 22, 2010, or for 319 days, tolling the limitations period on Plaintiff's claims during that time. As a result, the claims that accrued after February 6, 2007, may be considered by the Court in assessing Plaintiff's claims under the NYSHRL and NYCHRL.[16]

### iii. Sections 1981 and 1983

The statute of limitations for claims brought under § 1983 is three years. *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013). The statute of limitations for claims brought under § 1981, as amended by the Civil Rights Act of 1991, is four years. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004); *see Morales v. Cnty. of Suffolk*, 952 F. Supp. 2d 433, 436

---

[16] Although the continuing violation exception to the limitations period is also recognized in the context of NYCHRL and NYSHRL claims, *see Bermudez v. City of New York*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011), Plaintiff's NYSHRL and NYCHRL claims are identical to her Title VII claims. As discussed in the previous section, Plaintiff cannot show a continuing violation with respect to her sexual harassment claim, and Plaintiff's claim of a demeaning hostile work environment is based on actions that occurred in 2009, within the limitations period.

(E.D.N.Y. 2013) ("The statute of limitations for claims brought pursuant to 42 U.S.C. § 1981 is also three years unless the claims arise out of a post–1990 Act of Congress such as the 1991 Amendments to § 1981 . . . in which case the statute of limitations is four years.").  Neither limitations period is tolled during the pendency of EEOC administrative proceedings.  *See Plumey v. New York State*, 389 F. Supp. 2d 491, 497 (S.D.N.Y. 2005) (citing *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 465 (1975) and *Zangrillo v. Fashion Inst. of Tech.*, 601 F. Supp. 1346 (S.D.N.Y. 1985)), *aff'd*, 788 F.2d 2 (2d Cir. 1985)); *see also Caravantes v. 53rd St. Partners, LLC*, No. 09-CV-7821, 2012 WL 96474 (S.D.N.Y. Jan. 12, 2012) (applying *Johnson* to conclude that § 1981 claims of employment discrimination are not tolled by EEOC complaints).  Accordingly, the Court considers Plaintiff's claims of discrimination brought pursuant to § 1983 that accrued after December 22, 2007, and Plaintiff's claims of discrimination brought pursuant to § 1981 that accrued after December 22, 2006.[17]

### e.  Discrimination claims — Title VII, the NYSHRL, § 1981 and § 1983

Plaintiff claims that Defendants discriminated against her on the basis of race and gender in violation of Title VII, the NYSHRL, § 1981, and § 1983.[18]  Title VII prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms,

---

[17]  Although the continuing violation exception to the limitations period is also recognized in the context of § 1983 claims, *see Plumey v. New York State*, 389 F. Supp. 2d 491, 498 (S.D.N.Y. 2005), Plaintiff's § 1983 claims are identical to her Title VII claims.  As discussed in the previous section, Plaintiff cannot show a continuing violation with respect to her sexual harassment claim, and Plaintiff's claim of a demeaning hostile work environment are based on actions that occurred in 2009, within the limitations period.

[18]  The Court is mindful that these claims involve four different limitations periods, namely, March 13, 2009 for claims brought under Title VII, December 22, 2007 for claims brought under § 1983, February 6, 2007 for claims brought under the NYSHRL, and December 22, 2006 for claims brought under § 1981.  The Court will only consider conduct as of the specified date for each claim.

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Claims of disparate treatment under Title VII, the NYSHRL, § 1981 and § 1983 are assessed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[19] *See e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253–55 (1981); *United States v. City of New York*, 717 F.3d 72, 83–84 (2d Cir. 2013) (discussing application of *McDonnell Douglas* framework to race discrimination claim). Under the framework, a plaintiff must first establish a *prima facie* case of discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 506; *see also Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 11 (2d Cir. 2013); *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). A plaintiff's burden at this stage is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 506). If the plaintiff satisfies this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *St. Mary's Honor Ctr.*, 509 U.S. at 506–07; *Ruiz*, 609 F.3d at 492. The

---

[19] The burden of proof and production for employment discrimination claims under Title VII, § 1981, § 1983 and the NYSHRL are identical. *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013) ("For a claim of employment discrimination under 42 U.S.C. §§ 1981 and 1983, we apply the familiar burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*." (quoting *Raytheon Co. v. Hernandez,* 540 U.S. 44, 50 n.3 (2003) and citing *McDonnell Douglas Corp. v. Green* 411 U.S. 792, 802–03, (1973))); *Chick v. Cnty. of Suffolk*, --- F. App'x ---, ---, 2013 WL 6332682, at *1 (2d Cir. Dec. 6, 2013) ("Section 1983 employment discrimination claims asserted as equal protection violations are evaluated under the same standards as Title VII claims."); *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (same); *Broich*, 462 F. App'x at 42 ("A plaintiff's efforts to establish the second element of a § 1981 claim are subject to the same burden-shifting analysis as intentional discrimination claims brought under Title VII of the Civil Rights Act of 1964." (citing *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 146 (2d Cir. 1999))); *Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012) ("Claims brought under the NYSHRL 'are analyzed identically' and 'the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII.'" (alteration in original) (quoting *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999))).

defendant's burden "is not a particularly steep hurdle." *Hyek v. Field Support Servs.*, 702 F. Supp. 84, 93 (E.D.N.Y. 2010). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr.* , 509 U.S. at 509). "If the employer is able to satisfy that burden, the inquiry then returns to the plaintiff, to demonstrate that the proffered reason is a pretext for discrimination." *United States v. City of New York*, 717 F.3d at 102. To defeat summary judgment at this stage, "a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2522–23 (2013) ("An employee who alleges status-based discrimination under Title VII . . . [must] show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

### i. *Prima Facie* case

To establish a *prima facie* case of employment discrimination under Title VII, a plaintiff must show that: "(1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Mills v. S. Connecticut State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013); *Ruiz*, 609 F.3d at 491–92. Defendants do not dispute that Plaintiff is a member of a protected class as an African-American woman. (Defs. Mem. 6.) Nor do they challenge whether Plaintiff was qualified for her position as Lieutenant, to which she was appointed in 1997. (Pl. Dep. 30:23.) The only disputed issues

are whether Plaintiff suffered an adverse employment action and if so, did it occur under circumstances giving rise to an inference of discrimination.

### 1. Adverse employment action

Plaintiff argues that she was subject to multiple adverse employment actions, which can be sorted into five main categories: (1) being required to remove the window covering from her office door and threatened with discipline for failing to do so, (Pl. Opp'n Mem. 7–8), (2) receiving undesirable units and assignments, including being assigned to work in multiple units rather than being allowed to focus on one unit as were other lieutenants, (Oral Arg. Tr. 20:4–13, 29:5–18), being left without a supervisor for six to seven months and being "forced" to assume the duties of that supervisor (Pl. Opp'n Mem. 7), being assigned to an undesirable unit, (*id*. at 9–10), and given the "made up" position of "Administrative Lieutenant," and being asked to fill in for a sergeant in the field, (3) not being transferred to the unit closest to her home, (*id*. at 10), (4) becoming the target of excessive scrutiny and negative comments in her evaluation in 2010, (*id*. at 7–8), and (5) denial of overtime, (*id*. at 10–11).

The Second Circuit has made clear that an "[a]n adverse employment action is a materially adverse change in the terms and conditions of employment." *Mathirampuzha*, 548 F.3d at 78 n.7. Such action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown*, 673 F.3d at 150 (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006)). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (alteration, citation and internal quotation marks omitted).

As discussed below, the Court finds that, while Plaintiff may have been treated differently from other lieutenants in various respects, Plaintiff has not met her burden to establish that she experienced a materially adverse employment action, as required under Title VII, the NYSHRL, § 1983 and § 1981.[20]

## A.   Window covering

Plaintiff argues that a directive issued in 2006 to all staff at the office located at 30-10 Starr Avenue requiring them to keep their windows uncovered, and Sammarco's actions in targeting Plaintiff for discipline when Sammarco returned to the office at 30-10 Starr Avenue in

_____

[20] Plaintiff suggests that Defendants' actions should be considered in the aggregate rather than in isolation, arguing that "[a]lthough Plaintiff suffered no adverse employment action, such as a termination or demotion, Plaintiff suffered multiple adverse employment actions at different times at the Sheriff's Office."  (Pl. Mem. 8).  It is not clear whether state and federal antidiscrimination laws permit the Court to aggregate individual discrete acts to attempt to satisfy the "adverse employment action" prong of Plaintiff's *prima facie* case.  Several district courts have rejected this approach.  *See Kaur v. N.Y.C. Health & Hospitals Corp.*, 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010) ("It should also be noted that there is no authority for the proposition that this Court should consider the cumulative effect of individually alleged adverse employment actions when evaluating Plaintiff's discrimination claim."); *Figueroa v. New York Health & Hospitals Corp.*, 500 F. Supp. 2d 224, 230 (S.D.N.Y. 2007) ("Plaintiff cites no case law, and this Court is aware of none, which supports the proposition that we are to consider the cumulative effect of individually alleged adverse employment actions when evaluating an intentional discrimination claim, as plaintiff alleges here."); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 356 (S.D.N.Y. 2006) ("Although . . . Title VII hostile work environment claims and retaliation claims involve different findings regarding adverse employment actions, the Plaintiff cites no law, and the Court is aware of none, that supports the proposition that the Court can consider the cumulative effect of non-adverse employment actions when evaluating an intentional discrimination claim.").

However, the Second Circuit has suggested that such an argument is cognizable under Title VII.  *See Cunningham v. N.Y.S. Dep't of Labor*, 326 F. App'x 617, 619 (2d Cir. 2009) (addressing a "litany of actions [including] unfounded charges of time abuse, reassignment of offices, discontinuing a training conference organized by plaintiff, and excluding plaintiff from a conference and a hiring decision] that, according to plaintiff, constitute adverse employment action when 'considered in their totality,'" and finding that "plaintiffs allegations are — each and together — nothing more than everyday workplace grievances" and not an adverse employment action for purposes of employment discrimination claim (citing *Galabya*, 202 F.3d at 640)).  However, the Court need not decide this issue since whether considered individually or in the aggregate, Plaintiff has not shown that she suffered any adverse employment action.

2010 and observed that Plaintiff's window was covered constitute adverse actions. (Pl. Opp'n Mem. 8.) As discussed *supra* in section II.b, Plaintiff is barred from seeking review of all actions that took place prior to December 22, 2006 (the limitations period for her claim with the earliest limitations period, the § 1981 claim). Plaintiff is also barred from having the Court review her challenge to the directive issued in 2006 because she did not file a lawsuit within 90 days of receiving a right-to-sue letter from the EEOC in connection with precisely this claim.

As for Sammarco's actions in 2010, while the record shows that Sammarco informed Plaintiff's supervisor in 2010 that he would seek charges against Plaintiff for disobeying his order if she did not remove the window covering, there is no evidence that Plaintiff was ever charged or disciplined and Plaintiff does not assert that she was disciplined or charged. (Defs. 56.1 ¶ 66; Pl. 56.1 ¶ 66.) Rather, Plaintiff complied with the directive. A mere threat of discipline is not an adverse employment action. *See Uddin v. City of New York*, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) ("courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." (quoting *Honey v. County of Rockland,* 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002))). The threat that Plaintiff would receive disciplinary charges for having her window covered in 2010, which discipline never materialized, cannot be considered to be a materially adverse employment action. *See Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) ("[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner."); *Wharton v. Cnty. of Nassau*, No. 10-CV-0265, 2013 WL 4851713, at *8 (E.D.N.Y. Sept. 10, 2013) ("[O]ral and written warnings do not amount to materially adverse conduct." (quoting *Chang v. Safe*

*Horizons,* 254 F. App'x 838, 839 (2d Cir. 2007)); *Cunningham,* 326 F. App'x at 619

("[E]veryday workplace grievances, disappointments, and setbacks do not constitute adverse

employment actions within the meaning of Title VII.").

### B.    Multiple and undesirable units and assignments

Plaintiff argues that Defendants subjected her to an adverse employment action when

they (1) assigned her, between 2006 and 2008, to work in multiple units rather than allowing her

to focus on just one unit as other lieutenants were allowed to do, (2) left her without a supervisor

for six to seven months between November 2007 and May 2008 and "forced" her to assume the

duties of that supervisor,[21] (3) assigned her to an undesirable unit in June 2009, giving her the

"made up" position of "Administrative Lieutenant," and (4) required her to take on additional

tasks and duties that were outside the scope of work for lieutenants of her seniority, including

filling in for a sergeant in the field.  Plaintiff argues that these multiple and additional duties

were disruptive and "not a 'mere inconvenience.'"  (Pl. 56.1 ¶ 37.)  In addition, Plaintiff argues

that being the only lieutenant who was required to work in multiple units and not being permitted

to focus on just one unit was demeaning and undermined her ability to excel.  (Pl. 56.1 ¶ 20.)

"[A]ssignments that are part of an employee's normal responsibilities are not 'adverse

employment actions' where . . . the rate of pay and benefits remains the same."  *Rodriguez v.*

*Coca Cola Refreshments USA, Inc.*, No. 12-CV-234, 2013 WL 5230037, at *3 (E.D.N.Y.

Sept. 16, 2013) (collecting cases); *see also Potash v. Florida Union Free Sch. Dist.*, --- F. Supp.

2d ---, ---, 2013 WL 5273792, at *18 (S.D.N.Y. Sept. 18, 2013) ("Changes in assignments or

responsibilities that do not 'radically change' the nature of work are not typically adverse

---

[21]  Because the first two events occurred prior to March 13, 2009, they are time-barred
under Title VII.  However the Court considers these actions as part of Plaintiff's NYSHRL,
§ 1983 and § 1981 claims.

employment actions." (alteration omitted) (citing *Galabya,* 202 F.3d at 640)).  However "a change in duties or job reassignment may be an adverse employment action, 'if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career.'" *Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 211 (E.D.N.Y. 2013) (quoting *Galabya*, 202 F.3d at 641); *see also Velasquez v. Gates,* No. 08-CV-2215, 2011 WL 2181625, at *10 (E.D.N.Y. June 3, 2011) (same).  Likewise, a "[d]isproportionately heavy workload could perhaps be an adverse action, if the additional work significantly changed the employee's responsibilities so as to diminish that worker's role or status . . . ." *Lopez v. Flight Servs. & Sys., Inc.*, 881 F. Supp. 2d 431, 441 (W.D.N.Y. 2012); *see also Feingold*, 366 F.3d at 152–53 (finding that being subjected to "an excessive workload" could be an adverse employment action); *Edwards*, 957 F. Supp. 2d at 211 ("[T]he 'assignment of a disproportionately heavy workload' can constitute an adverse employment action." (quoting *Grana v. Potter*, No. 06-CV-1173, 2009 WL 425913, at *12 (E.D.N.Y. Feb. 19, 2009))).  "Similarly, comparatively poor assignments can constitute adverse employment actions." *Grana*, 2009 WL 425913, at *12 (alteration, citation and internal quotation marks omitted).  Thus, in order for a plaintiff to sustain her claim that a change in work duties amounts to an adverse employment action, she must show a material change in her work duties.  "A plaintiff can make such a showing by demonstrating that the new assignment was 'materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement.'" *Edwards*, 957 F. Supp. 2d at 211 (quoting *Galabya*, 202 F.3d at 641)).

There is no evidence that Plaintiff's tasks and assignments had any actual material, as opposed to a speculative, impact on her job.  The fact that Plaintiff found being assigned to work across and be responsible for multiple units "distracting from time to time" and "difficult"

because she could not "concentrate on one thing all the time," is insufficient evidence to demonstrate an adverse employment action. (*See* Pl. Dep. 54:11–12.) Plaintiff has presented no evidence that this "distraction" or failure to concentrate on one unit had a material impact on Plaintiff's career. *See Carter v. New Venture Gear, Inc.*, 310 F. App'x 454, 457 (2d Cir. 2009) ("[The plaintiff] did not meet her burden of raising a genuine issue of material fact that her assignment to an admittedly equally paying and comparable job was materially less prestigious, 'materially less suited to her skills and expertise, or materially less conducive to career advancement.'" (alteration omitted) (quoting *Galabya*, 202 F.3d at 641)); *Hernandez v. City of New York*, No. 11-CV-3521, 2013 WL 593450, at *3 (E.D.N.Y. Feb. 13, 2013) (concluding that "Plaintiff's allegations are the same 'alteration' of job responsibilities, rather than 'significantly diminished material' responsibilities, which the Second Circuit has declined to deem an adverse employment action" (quoting *Galabya*, 202 F.3d at 640)).

Similarly, Plaintiff has not shown that being left without a supervisor and being "forced" to assume her supervisor's duties was a material adverse action. Plaintiff states that the duties did not amount to considerably more work or otherwise "overloaded" her schedule. The work caused Plaintiff to work an additional 20 to 30 minutes "a few times." Plaintiff has failed to demonstrate that there was anything adverse or material about her taking on these additional responsibilities.

Plaintiff's claim that being assigned to the undesirable Kendra's Unit and given the title of "Administrative Lieutenant" was an adverse action is also unavailing. The delegation of secretarial tasks below or outside an employee's job description has been found to constitute an adverse employment action by several courts in this Circuit. *See Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 356 (S.D.N.Y. 2007) (finding that a

plaintiff who proffered evidence that "although she did receive substantive work assignments, many of the tasks assigned to her were inappropriately administrative or secretarial, and similarly situated male workers' assignments were not so dominated by such work," had established *prima facie* adverse action at summary judgment stage).  However, this is not a case where Plaintiff was assigned to Kendra's Unit and given the title of Administrative Lieutenant in order to perform inappropriately menial tasks and duties below her rank.  Although the placement in the unit and the title of Administrative Lieutenant were subjectively undesirable to Plaintiff, she was not asked to perform tasks that were outside of her job description.  (*See* Pl. Dep. 83–85.)  Nor was Plaintiff required, at that time, to serve in the field except in a supervisory capacity.  (*Id.* at 84.)  Thus, Plaintiff's assignment to Kendra's Unit and being given the title of Administrative Lieutenant were not material alterations of her job responsibilities amounting to a demotion or otherwise materially impacting her work experience.  *See Jeffrey v. Montefiore Med. Ctr.*, No. 11-CV-6400, 2013 WL 5434635, at *19 (S.D.N.Y. Sept. 27, 2013) ("Plaintiff's assertion that she was assigned 'less meaningful tasks' . . .  is precisely the sort of 'mere inconvenience or an alteration of job responsibilities' that cannot constitute an adverse action [where] Plaintiff conceded that her pay and hours remained the same . . . and admitted that the purported 'less meaningful tasks' were actually no different than the work [employees with his title] normally do, leaving the Court with no 'objective indicia of material disadvantage' from which to find an adverse action.").

At the September 4, 2009 meeting, Plaintiff was asked to fill in for a sergeant, a lower-ranked position, in the field.  Although reassignment to a position that is objectively less prestigious can be considered materially adverse in the context of a retaliation claim, *see Kessler*, 461 F.3d at 209 (2d Cir. 2006) (affirming finding that reassignment that led to tasks that were

"dirtier, more arduous, and less prestigious" would have been materially adverse to a reasonable employee), a request that Plaintiff fill in on a few occasions for a lower-ranked individual is not similarly material in its adversity, *see Brown v. City of New York*, No. 11-CV-2915, 2013 WL 3789091, at *16 (S.D.N.Y. July 19, 2013) ("The assignment of minor, additional duties — especially where similar tasks have been a part [plaintiff's] duties in the past — may be 'minor annoyances.' But they are not 'materially adverse change[s] in the terms and conditions of [plaintiff's] employment.'" (alterations in original) (quoting *Burlington Northern*, 548 U.S. at 68)). Particularly in light of the evidence that Plaintiff eventually participated in field duty only two or three times, and then only in a supervisory capacity when another Lieutenant, Zane, who normally was in the field with her unit, was not available, (Pl. Dep. 94:20–25, 99:13–24; Pl. 56.1 ¶ 109), the request and subsequent requirement to fill in for a sergeant in the field was not an adverse employment action.

### C.   Failure to transfer Plaintiff

Plaintiff's inability to transfer to a unit located physically closer to her home, as she alleges other lieutenants were able to do, is not an adverse employment action. Plaintiff never requested a transfer in 2009.[22] Prior to January 2011 when her request was granted, Plaintiff told her former supervisor, Talamo that if a position ever became available in the Queens location, she would be interested in it. (Pl. Dep. 87:21–88:6.) However, Talamo retired in November 2007 and was no longer working in the Sheriff's Office at the time of the June 2009 transfers. (Defs. 56.1 ¶ 135; Pl. 56.1 ¶135.) Without having requested a transfer in 2009 and been denied her request, Plaintiff's claim has no merit. *Cf. Beyer v. Cnty. of Nassau*, 524 F.3d

---

[22] Plaintiff contends that "[s]ometimes you would get [the opportunity to request a transfer] but mostly it's just implied that you would want to work in the borough closest to your residence." (Pl. Dep. 81:23–25.)

160, 166 (2d Cir. 2008) (holding that "employee has established the 'adverse employment

action" necessary to make out a *prima facie* case when she has proffered evidence from which a

reasonable trier of fact could conclude that the transfer *sought and denied* would have involved

an objective and significant improvement in the terms, conditions, or privileges of her

employment." (emphasis added)); *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir.

2004) (noting that plaintiff "must establish that [the defendant's] *denial of her request* for a

transfer created a materially significant disadvantage in her working conditions").

 Plaintiff states that she did not request a transfer because she was not aware that her unit

would be dissolved.  However, even if Plaintiff had requested and been denied a transfer,

Plaintiff still would not be able to show an adverse employment action because Plaintiff could

not show that the denial of transfer was a material disadvantage.  *Pacheco v. New York*

*Presbyterian Hosp.*, 593 F. Supp. 2d 599, 617 (S.D.N.Y. 2009) (finding that "a nominally lateral

transfer, even without any loss in salary, can constitute an adverse employment action under

Title VII" if plaintiff can show "'that the transfer created a materially significant disadvantage.'"

*Id.* (quoting *Galabya*, 202 F.3d at 641 and citing *De la Cruz v. New York City Human Res.*

*Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir. 1996))); *see also Beyer*, 524 F.3d at 164 ("A

denial of a transfer may also constitute an adverse employment action, but we require a plaintiff

to proffer objective indicia of material disadvantage; 'subjective, personal disappointment[]' is

not enough." (quoting *Galabya*, 202 F.3d at 640)).  Plaintiff's only proffered reason for wanting

the transfer was the convenience of being closer to home.  There is no evidence that any other

condition of Plaintiff's employment would have changed and Plaintiff has not shown or alleged

that having to travel further to work was a material disadvantage.  Under these circumstances,

Defendants' failure to accommodate Plaintiff's implied request to be transferred to a location

closer to her home is not an adverse employment action. *See Taylor v. N.Y.C. Dep't of Educ.*, No. 11-CV-3582, 2012 WL 5989874, at *7 (E.D.N.Y. Nov. 30, 2012) (denial of request for transfer that would have reduced plaintiff's daily commute by more than four hours not adverse, where there was no evidence "that the transfer would have offered her materially different terms and conditions of employment, such as more money, prestige, or authority"); *Charles v. Connecticut, Judicial Branch, Court Support Servs. Div.*, 556 F. Supp. 2d 123, 128 (D. Conn. 2008) (employer's decision not to transfer plaintiff from the Milford office to the New Haven office not adverse employment action); *Pimentel v. City of New York*, No. 00-CV-326, 2002 WL 977535, at *4 (S.D.N.Y. May 14, 2002) (denial of request for a lateral transfer from Manhattan to Brooklyn office not an adverse employment action), *aff'd*, 74 F. App'x 146 (2d Cir. 2003).

### D. Excessive scrutiny and discipline

Plaintiff argues that she suffered adverse employment actions when she was singled out for excessive scrutiny and discipline, including (1) verbal reprimands to her supervisor in 2010 for permitting Plaintiff to change her shift hours to accommodate a culinary class she was taking for a period of eleven months, and (2) LaRose ordering her supervisor to include details about Plaintiff's minor infractions on her 2009–2010 evaluation. (Pl. Opp'n Mem. 7–8.) Neither of these are materially adverse actions. "[C]riticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) (citation omitted); *see also Dawson v. City of New York*, No. 09-CV-5348, 2013 WL 4504620, at *10 (S.D.N.Y. Aug. 19, 2013) ("Excessive scrutiny, monitoring, and criticisms of her job performance," not adverse employment actions absent evidence of materially adverse impact); *Sesay-Harrell v. NYC Dep't of Homeless Servs.*, No. 12-CV-925, 2013 WL 6244158, at

*15 (S.D.N.Y. Dec. 2, 2013) (disciplinary measures and supervisory inaction not adverse employment actions); *Costello v. N.Y.S. Nurses Ass'n*, 783 F. Supp. 2d 656, 677–78 (S.D.N.Y. 2011) (finding that Plaintiff's alleged actions qualified as adverse employment actions, including "giving negative performance evaluations; micromanaging her schedule and denying her a work-at-home day; attempting to overload her to cause her to be deficient in her job performance; failing to provide her with necessary information and/or support, thereby setting her up to fail and engaging in conduct designed to result in discipline; and inundating her with emails and questions regarding her work performance'" (alteration, citation and internal quotation marks omitted).

Similarly, "[n]egative reports or evaluations alone are generally not adverse employment actions, but they can be considered adverse employment actions when they give rise to 'material adverse changes in work conditions.'" *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 351 (S.D.N.Y. 2006) (quoting *Hawana v. City of New York*, 230 F. Supp. 2d 518, 528 (S.D.N.Y. 2002)); *see also Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 17 (2d Cir. 2011) ("While negative employment evaluation letters[] or reprimands may be considered adverse employment actions," that is not the case where there is "no proof that [the] evaluation had any effect on the terms and conditions of [the plaintiff's] employment." (citations and internal quotation marks omitted); *Jantz*, 2012 WL 370297, at *9 ("[N]egative evaluations without accompanying adverse results are not sufficient to constitute adverse employment actions."); *cf. Weber v. City of New York*, --- F. Supp. 2d ---, at ---, 2013 WL 5416868, at *30 (E.D.N.Y. Sept. 29, 2013) ("Plaintiff's unsatisfactory performance evaluations which led to the initiation of 3020–a charges culminating in the suspension of Plaintiff qualify as adverse employment actions since Plaintiff suffered a materially adverse change in the terms and conditions of employment that was more disruptive

than a mere inconvenience or an alteration of job responsibilities." (alteration, citation and internal quotation marks omitted)). For purposes of an employment discrimination claim, a negative performance evaluation, absent any subsequent discipline or material impact, such as an effect on plaintiff's promotion opportunities or pay, is not an adverse employment action.

The fact that Plaintiff's supervisor was reprimanded for a decision he made to allow Plaintiff to change her work schedule is not conduct that affected Plaintiff. Plaintiff was allowed to continue working the flexible schedule until she completed her course. (Defs. 56.1 ¶ 44; Pl. 56.1 ¶ 44.) In addition, there is no evidence that the three comments made by LaRose and appended to Plaintiff's 2010 evaluation led to any discipline, or that these evaluations became material to a promotion or other employment opportunity for Plaintiff. Absent such a showing, the negative comments attached to Plaintiff's evaluations are not an adverse employment action.

### E. Denial of overtime opportunities

Plaintiff asserts that she was denied the opportunity to earn overtime and that this denial was an adverse employment action, but Plaintiff has not shown that she was denied overtime. (Pl. Opp'n Mem. 10–11.) A deprivation of the opportunity to earn overtime can be considered a materially adverse employment action. *See Mazyck v. Metro. Transp. Auth.*, 893 F. Supp. 2d 574, 589 (S.D.N.Y. 2012) (finding that plaintiff who was denied requested overtime had shown adverse employment action); *Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 235 (W.D.N.Y. 2011) ("The denial of overtime may constitute an adverse employment action in some circumstances[.]"); *Little v. Nat'l Broad. Co., Inc.*, 210 F. Supp. 2d 330, 379 (S.D.N.Y. 2002) (evidence that plaintiff "incurred an actual loss in income because of lost overtime and that he was forced to work undesirable shifts with an erratic schedule . . . if true, could prove that [plaintiff] was subject to an adverse employment action").

Plaintiff argues that because she worked without a supervisor between November 2007 and May 2008, by the time she learned about overtime opportunities, they "were already a done deal" in that other lieutenants had already been chosen. (Pl. Dep. 202:5–209:1.) While Plaintiff claimed that other staff in the Sheriff's Office who were junior to her received overtime assignments, she could not provide any specific examples, and there is no other evidence in the record to support this claim. Plaintiff concedes that on at least one occasion, notification of the opportunity to apply for overtime was distributed by a general email either to the entire Sheriff's Office or to all lieutenants. (Pl. Dep. 202:17–203:24.) There is no evidence that Plaintiff requested overtime for either this or any other detail, and that she was denied overtime. Instead, Plaintiff's argument is based on her belief or hunch that, even if she had applied for overtime assignments, she would have been denied overtime because others had already been pre-selected. Plaintiff's only evidence is her own belief that this hunch was in fact true. She points to no evidence as to how individuals were selected for overtime, or testimony by others with knowledge of such "pre-selection" of favored individuals for overtime. Such bare allegations are insufficient to establish an adverse employment action. *See Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 236 (W.D.N.Y. 2011) (finding that plaintiff could not show that denial of overtime comprised an adverse employment action where he did not "identify any instance where he was denied requested overtime work so that it could be given to others"); *Hayle v. Nassau Health Care Corp.*, No. 08-CV-2396, 2013 WL 6231164, at *6 (E.D.N.Y. Dec. 2, 2013) ("Plaintiff's complaint that she was not able to get as much overtime as the other supervisors in her department is also deficient because it is comprised only of her own conclusory testimony."); *cf. Little*, 210 F. Supp. 2d at 379 (recognizing denial of overtime as an adverse action where plaintiff produced evidence that "he incurred an actual loss in income because of lost overtime").

### F.    Aggregate impact

Finally, Plaintiff contends that Defendants' actions should be considered in the aggregate rather than in isolation, arguing that "[a]lthough Plaintiff suffered no adverse employment action, such as a termination or demotion, Plaintiff suffered multiple adverse employment actions at different times at the Sheriff's Office." (Pl. Opp'n Mem. 8.) Assuming without deciding that the Court may properly aggregate all of the complained-of conduct, and doing so, the Court's conclusion remains the same — the collective impact never resulted in any *material* change to the terms and conditions of Plaintiff's employment. Plaintiff speculates about how various actions *could have* affected her career. (*See, e.g.*, Pl. Dep. 190:22–191:6 (acknowledging that Plaintiff had not applied for a promotion to the next level, and noting that "if I had wanted to become chief," then a counseling memorandum in her personnel filed could harm that chance).) However, she has not presented any evidence that it actually did so, such as showing that she applied for and was denied a promotion to the next level in her department, or that, other than having to complete occasional undesirable tasks, she experienced some action equivalent to a demotion, or a material increase in her work load. (*See* Pl. 56.1 ¶ 118; Pl. Dep. 118:15–16, 119:6–7.)

In sum, the Court finds that these actions, individually or in the aggregate, do not amount to a materially adverse change in the terms and conditions of Plaintiff's employment. *See Cunningham*, 326 F. App'x at 619 (finding that "litany of actions [including] unfounded charges of time abuse, reassignment of offices, discontinuing a training conference organized by plaintiff, and excluding plaintiff from a conference and a hiring decision] that, according to plaintiff, constitute adverse employment action when 'considered in their totality,'" not an adverse employment action for purposes of employment discrimination claim. (citing *Galabya*,

202 F.3d at 640)); *Mills*, 519 F. App'x at 75 (holding that a variety of actions taken by an employer with respect to an employee — including remarks, intimidating behavior, shunning by colleagues, refusal to permit employee to engage in her desired duties, and refusal to accommodate scheduling requests — did not constitute adverse employment actions, because they did not "indicate 'a materially adverse *change* in the terms and conditions of employment.'" (quoting *Mathirampuzha*, 548 F.3d at 78)).

Because Plaintiff cannot show that she experienced an adverse employment action, her *prima facie* case of employment discrimination on the basis of race and gender fails. Plaintiff's Title VII, NYSHRL, § 1981 and § 1983 discrimination claims and are therefore dismissed.

### f.    Retaliation — Title VII, the NYSHRL and § 1981[23]

Plaintiff claims that Defendants retaliated against her for complaining internally to the EEO office, for filing external complaints with the EEOC, and for "sp[eaking] out against an order" on September 9, 2009, assigning tasks to her that were beneath her job level. Title VII

---

[23]  Although Plaintiff asserts a retaliation claim under § 1983, (Oral Arg. Tr. 2:19–24), it is not clear that such claims are cognizable in the Second Circuit. *See Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996) ("[W]e know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of . . . discrimination. Given the availability of Title VII, which [plaintiff] has chosen not to invoke, we see no reason to break new constitutional ground in this case."); *Pedrosa v. City of New York*, No 13-CV-01890, 2014 WL 99997, at *8 (S.D.N.Y. Jan. 9, 2014) ("Retaliation claims under § 1983 are commonly brought as First Amendment free speech claims, but are not actionable as Fourteenth Amendment equal protection claims."). The Court acknowledges that there is some support for recognizing this claim in this context. *See Hicks v. Baines*, 593 F.3d 159, 171 (2d Cir. 2010) ("The premise of this lawsuit is that plaintiffs were treated differently — that is, they suffered retaliation — on the basis of their participation in discrimination investigations and proceedings. That participation obviously constitutes an 'impermissible' reason to treat an employee differently."); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) (discussing identical analysis for retaliation claims brought "under Title VII . . . the NYSHRL, and § 1983"), *aff'd*, 713 F.3d 163 (2d Cir. 2013). In any event, as § 1983 claims are generally construed in an identical manner to Title VII claims, the Court need not resolve this discrepancy as Plaintiff's Title VII retaliation claim does not survive summary judgment.

prohibits discrimination against an employee "because he has opposed any practice made an unlawful employment practice." 42 U.S.C.A. § 2000e-3(a); *see also Tepperwien*, 663 F.3d at 567 ("Title VII . . . prohibits an employer from taking 'materially adverse' action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity." (citations omitted)); *Hicks v. Baines*, 593 F.3d 159, 161 (2d Cir. 2010) (same).   Retaliation claims under Title VII and the NYSHRL are assessed using the *McDonnell Douglas* burden-shifting framework. [24]  *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) ("The burden-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation claims under both Title VII and the NYSHRL" (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006))); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008) (holding that "42 U.S.C. § 1981 encompasses claims of retaliation");  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) ("Retaliation claims made under 42 U.S.C. § 1981, like those made under Title VII, are evaluated using a three-step burden-shifting analysis.").

Under the test, "[f]irst, the plaintiff must establish a *prima facie* case of retaliation.  If the plaintiff succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory." *Fincher*, 604 F.3d at 720 (citations omitted); *see also Tepperwien*, 663 F.3d at 568 n.6 (discussing the burden shifting analysis in retaliation context); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (same).  If the employer succeeds at the second stage,

---

[24]  The Court is mindful that these claims involve three different limitations periods, namely, March 13, 2009 for claims brought under Title VII, February 6, 2007 for claims brought under the NYSHRL, and December 22, 2006 for claims brought under § 1981.  The Court will only consider conduct as of the specified date for each claim.

the presumption of retaliation dissipates, and the plaintiff must show that, *but for* the protected

activity, she would not have been terminated.[25]  *See Nassar*, 570 U.S. at ---, 133 S. Ct. at 2534

---

[25]  It is unclear whether the Supreme Court decision in *Nassar*, which changed the standard for establishing causation in a retaliation claim from showing that retaliation was a "motivating factor," to showing that it is a "but-for" cause of the adverse employment action, applies to retaliation claims brought pursuant to the NYSHRL.  New York State courts have yet to directly address the impact of the Supreme Court's recent holding in *Nassar* on the NYSHRL, nor has the Second Circuit had the opportunity to address this issue.  *See Giudice v. Red Robin Int'l, Inc.*, --- F. App'x ---, ---, 2014 WL 552668, at *2 (2d Cir. Feb. 13, 2014) (declining to address "any differences between the standard stated in *Summa* [holding that retaliation claims under Title VII and NYSHRL are analyzed in an identical manner] and the Supreme Court's articulation of the 'but-for' standard in *Nassar*); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 n.7 (2d Cir. 2013) ("Because the plaintiff's claims survive under the *Nassar* 'but-for' standard, we do not decide whether the NYSHRL claim is affected by *Nassar,* which by its terms dealt only with retaliation in violation of Title VII.").  In deciding a retaliation claim under the NYSHRL after *Nassar*, the First Department did not specifically decide the issue but noted that the plaintiff "will be unable to prove that the challenged failure to reassign occurred, *in whole or in part*, because of retaliation."  *Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 981 N.Y.S.2d 89, 93 (App. Div. 2014) (emphasis added).

Traditionally, "[t]he standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL."  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000)); *Vandewater v. Canandaigua Nat. Bank*, 893 N.Y.S.2d 916 (2010) ("It is well settled that the federal standards under [T]itle VII of the Civil Rights Act of 1964 are applied to determine whether recovery is warranted under the Human Rights Law." (citing *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 330 (2004))).  The relevant provisions of Title VII and the NYSHRL are textually similar, and both prohibit an employer from discriminating or retaliating against an individual "because" he or she engaged in protected activity.  In *Nassar*, the Supreme Court held that under "the default rules" of statutory construction, "causation" should be interpreted as "but-for causation" "absent an indication to the contrary in the statute itself," and interpreted Title VII's use of "because" as requiring "proof that the desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2528 (2013).  Since the NYSHRL statutory language is the same, and the New York Court of Appeals has consistently stated that federal Title VII standards are applied in interpreting the NYSHRL, this Court will continue to interpret the standard for retaliation under the NYSHRL in a manner consistent with Title VII jurisprudence, as clarified by the Supreme Court in *Nassar*.  *See, e.g.*, *Russo v. New York Presbyterian Hosp.*, --- F. Supp. 2d ---, ---, 2013 WL 5346427, at * 18 (E.D.N.Y. Sept. 23, 2013) (discussing post-*Nassar* retaliation standard under NYSHRL); *Leacock v. Nassau Health Care Corp.*, No. 08-CV-2401, 2013 WL 4899723, at *9 n.4 (E.D.N.Y. Sept. 11, 2013) (continuing to construe the NYSHRL retaliation standard as requiring the same elements as Title VII after *Nassar* (citing *Dall v. St. Catherine of Siena Med. Ctr.*, --- F. Supp. 2d ---, ---, 2013 WL 4432354, at *19 n.12 (E.D.N.Y. Aug. 14, 2013))); *Dall*, --- F. Supp. 2d at ---, 2013 WL 4432354,

(emphasis added) (holding that a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"); *see also Ellis v. Century 21 Dep't Stores*, --- F. Supp. 2d ---, ---, 2013 WL 5460651, at *27 (E.D.N.Y. Sept. 28, 2013) (same); *Russo v. New York Presbyterian Hosp.*, --- F. Supp. 2d ---, ---, 2013 WL 5346427, at *18 (E.D.N.Y. Sept. 23, 2013) (same); *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *14 (E.D.N.Y. July 30, 2013) (same).

### ii. *Prima facie* case

In order to establish a *prima facie* case of retaliation, a plaintiff must establish "(1) she engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)); *see also Summa*, 708 F.3d at 125; *Schiano*, 445 F.3d at 608. The burden at the summary judgment stage for Plaintiff is "'minimal' and '*de minimis*,'" and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Kwan*, 737 F.3d at 844 (quoting *Jute*, 420 F.3d at 173). Defendants claim that Plaintiff cannot show that she engaged in any protected activity, or that she suffered an adverse action. (Defs. Mem. 14.)

---

at *19 n.12 (interpreting the plaintiff's NYSHRL retaliation claim consistently with his Title VII retaliation claim after *Nassar*); *Brown v. City of New York*, No. 11-CV-2915, 2013 WL 3789091, at *19 (S.D.N.Y. July 19, 2013) (reviewing the but-for causation requirement for Title VII retaliation articulated in *Nassar* and stating that the plaintiff's "retaliation claim under the NYSHRL is 'analytically identical to [her] claims brought under Title VII'" (citation omitted)).

### 1.   Protected activity and Defendants' knowledge

Under Title VII, protected activity includes both "opposing discrimination proscribed by the statute and . . . participating in Title VII proceedings." *Jute*, 420 F.3d at 173; *see also Tepperwien*, 663 F.3d at 567; *Hicks*, 593 F.3d at 161. Title VII's antiretaliation provision is "construed to cover a broad range of employer conduct." *Thompson v. N. Am. Stainless, LP*, 562 U.S. ---, ---, 131 S. Ct. 863, 868 (2011). It is not necessary that the conduct is actually prohibited by Title VII, but only that the plaintiff had a "good faith belief" that such conduct was prohibited. *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x. 206, 212 (2d Cir. 2010) ("It is well-established that a 'plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'" (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002))); *Dall v. St. Catherine of Siena Med. Ctr.*, No. --- F. Supp. 2d ---, ---, 2013 WL 4432354, at *20 (E.D.N.Y. Aug. 14, 2013) (plaintiff need only have a "good faith belief" that employer conduct was prohibited"); *Kanhoye v. Altana Inc.*, 686 F. Supp. 2d 199, 206 (E.D.N.Y. 2009) ("'An employee is privileged to report and protest workplace discrimination, whether that discrimination be actual or reasonably perceived.'" (quoting *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000))).

The complaint can be informal — an employee does not need to lodge a formal complaint of discrimination. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) ("[T]he law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection, this notion of 'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers

who have filed formal charges.'" (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990))); *Ellis*, --- F. Supp. 2d at ---, 2013 WL 5460651, at *29 ("In order to oppose sexual harassment, [p]laintiff need not have filed a formal complaint as long as she complained of activity that she had a good faith, reasonable belief violated the law."); *Bennett v. Hofstra Univ.*, 842 F. Supp. 2d 489, 500 (E.D.N.Y. 2012) (noting that Title VII does not require a formal complaint); *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 227 (E.D.N.Y. 2010) ("It is clearly established that 'informal complaints to supervisors constitute protected activity under Title VII.'" (citations omitted)).

However, while such complaints may be informal, they cannot be so vague or "generalized" that the employer could not "reasonably have understood[] that the plaintiff's complaint was directed at conduct prohibited by Title VII." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) (alteration and citation omitted); *see also Ellis*, --- F. Supp. 2d at ---, 2013 WL 5460651, at *28 (E.D.N.Y. Sept. 28, 2013) ("When making the complaint, Plaintiff must do so in "sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of [the protected status]." (quoting *Brummell v. Webster Central School Dist.*, No. 06-CV-6437, 2009 WL 232789, at *6 (W.D.N.Y. Jan. 29, 2009))); *Int'l Healthcare Exch.*, 470 F. Supp. 2d at 357 ("ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity").

Plaintiff's actions in filing internal EEO complaints, on May 22, 2006 and September 11, 2009, and a formal charge with the EEOC on August 22, 2006, are protected activities.[26]

---

[26] Plaintiff does not allege that Defendants retaliated against her for filing the December 2010 EEO complaint.

Plaintiff's May 2006 internal EEO complaint alleged that Sammarco's actions in promulgating the window directive were discriminatory, while her August 2006 EEOC charge complained of race and gender discrimination and harassment in connection with the window directive, as well as retaliation for making the internal complaint in May 2006, by assigning her "menial tasks."[27] (Pl. 56.1 ¶ 47; 2006 EEOC charge.)  Plaintiff's September 2009 EEO complaint alleged retaliation for stating that she did not want to do the job of a sergeant.  (*See* Defs. Ex. E and Pl. Ex. S.)  All of these are protected activities.

In addition, because the EEO complaints were filed with DOF, Plaintiff has demonstrated that Defendants had knowledge of those protected activities.  *See Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011) ("Even if the agents who carried out the adverse action did not know about the plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice.  'Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.'" (citations omitted)); *Henry*, 616 F.3d at 148 ("[A] jury may 'find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the

---

[27]    Although Plaintiff cannot sue for discrimination based on the conduct comprising the substance of these complaints, as she is barred by the statute of limitations and her failure to file a lawsuit within 90 days of receiving a right-to-sue letter, for purposes of her Title VII retaliation claim, the statute of limitations begins to run from the time of Defendants' allegedly retaliatory activity and not from the time of the Plaintiff's protected activity, the filing of these complaints. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (recognizing that statute of limitations for Title VII claims begins to run with "each retaliatory adverse employment decision"); *Hill v. Citibank Corp.*, 312 F. Supp. 2d 464, 473 (S.D.N.Y. 2004) ("With respect to the plaintiff's Title VII retaliation claim, the limitations period began running on April 20, 1999, when her assignment with Citibank was terminated.").  While the timing of Plaintiff's protected activity is a factor in determining whether it has temporal proximity to any retaliatory conduct that falls into the limitations period, it is not relevant in determining whether Plaintiff's retaliation claim is timely.

circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit[ly] upon the orders of a superior who has the requisite knowledge.'" (alteration in original) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000))).  As for Plaintiff's August 22, 2006 EEOC charge, because the EEOC responds to charges of discrimination by investigating the incident with the employer, the Court presumes that Defendants had knowledge of Plaintiff's charge, and Defendants have not asserted otherwise.  *See* 29 C.F.R. § 1691.5 ("Within ten days of receipt of a complaint of employment discrimination, an agency shall notify the [employer] that it has received a complaint of employment discrimination, including the date, place and circumstances of the alleged unlawful employment practice." (discussing procedures for complaints against recipients of federal funding)); *see also Roberts v. Fruit Fresh Up*, No. 08-CV-274, 2011 WL 2730946, at *10 n.2 (W.D.N.Y. July 12, 2011) (citing 29 C.F.R. § 1691.5(a) to note that "defendant likely had notice of the EEOC discrimination charge within ten days of plaintiff's filing of the EEOC discrimination charge").

However, Plaintiff's protest at the September 4, 2009 meeting to the request that she participate in field duty is not "protected activity" because there is no evidence that Plaintiff's protest was intended to indicate, or in any way indicated, that it was being made in opposition to race or gender discrimination.  Based on the version of the events at the September 4, 2009 meeting presented by both sides, Plaintiff's opposition to the request that she fill in for a sergeant, which would have required her to work in the field instead of solely in the office, was based on her seniority and her belief that her tenure at the Sheriff's Office should preclude her from filling in for a sergeant or doing field duty.  (Defs. 56.1 ¶ 105; Pl. 56.1 ¶ 105; Pl. Dep. 94:7–11.)  Even if Plaintiff subjectively felt or believed that the request was discriminatory, she

did not verbalize this belief at the meeting or subsequent to the meeting.  Absent any express statements indicating that she was protesting the order because it was discriminatory based on her race or gender, Plaintiff's actions at the September 4, 2009 meeting could not have put Defendants on notice that she felt the order to be discriminatory, and her protest is therefore not protected by the antiretaliation protections of Title VII, the NYSHRL and § 1981.  *See Rojas*, 660 F.3d at 108 (plaintiff's "generalized" complaints were not protected activity where employer "could not reasonably have understood that she was complaining of 'conduct prohibited by Title VII'" (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).

Accordingly, Plaintiff's protected activities are her internal EEO complaint of May 22, 2006, her EEOC charge of August 22, 2006, and her internal EEO complaint of September 11, 2009 alleging retaliation for stating that she did not want to do the job of a sergeant.  (Defs. Ex. E.)

### 2.    Adverse action

Plaintiff alleges that Defendants took a variety of disciplinary and other actions in retaliation for her filing the 2006 EEOC charge and the 2006 and 2009 EEO complaints, including: (1) assigning Plaintiff additional duties and work in multiple units beginning in 2006,[28] (2) giving Plaintiff negative evaluations between 2007 and 2010, (3) failing to transfer Plaintiff to a location closer to her home, (4) circulating Sammarco's notes from the September 4, 2009 meeting describing Plaintiff as "unprofessional," (5) ordering Plaintiff to fill in for a lower-ranked officer in the field, (6) issuing counseling memoranda for Plaintiff's statements and

---

[28]    Although this action is time-barred as to all of Plaintiff's claims, the Court considers it only for context regarding the retaliatory nature of Defendant's subsequent actions.

appearance at the September 4, 2009 meeting, and (7) subjecting Plaintiff to excessive monitoring and scrutiny subsequent to the September 4, 2009 meeting, by, among other things, requiring her to wear a uniform at all times, and questioning her supervisor's decision to allow her to change her shift to accommodate her course, and otherwise asking about Plaintiff's activities.

To establish an adverse employment action for purposes of a retaliation claim, "[a] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Fincher*, 604 F.3d at 721 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The scope of actions that may be materially adverse for purposes of a Title VII retaliation claim is broader than those actions prohibited by Title VII's anti-discrimination provisions; the latter apply to the terms and conditions of employment, while the former "anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'" *Hicks*, 593 F.3d at 165 (quoting Burlington N., 548 U.S. at 67) ; *see also Fincher*, 604 F.3d at 721 ("The anti-retaliation law 'protects an individual not from all retaliation, but from retaliation that produces an injury or harm.'" (quoting *Burlington N.*, 548 U.S. at 67)).  In addition, "the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks*, 593 F.3d at 165.  In evaluating whether an action is material, "'[c]ontext matters,' as some actions may take on more or less significance depending on the context." *Tepperwien*, 663 F.3d at 568.

The Court will assume that the counseling memorandum concerning Plaintiff's statements about her age is an adverse action and concludes that, arguably, Defendants' actions

subsequent to Plaintiff's September 11, 2009 EEO Complaint, considered in the aggregate, could dissuade a reasonable employee from making a complaint of discrimination.

### A. Additional duties

Plaintiff argues that immediately after she made an informal, verbal complaint in June 2006 to the internal EEO Officer, who notified LaRose about her complaint, LaRose retaliated against Plaintiff by assigning her additional duties in the Warrants Unit, and assigning her responsibilities in several additional units, including cigarette tax, auctions and building security detail ("DECAS"). (Pl. Opp'n Mem. 15.) Because LaRose's actions in June 2006 fall outside the limitations period for all of Plaintiff's claims (the earliest of which could accrue on December 22, 2006), this action is time-barred from consideration as a retaliatory action, although the Court considers it for context regarding the retaliatory nature of Defendants' subsequent actions.

### B. Negative evaluations

Plaintiff alleges that the evaluations she received between 2007 and 2009 were retaliatory. Plaintiff's argument that receiving a negative evaluation for the 2007–2008 year[29] was retaliatory is not availing, as the record shows that this evaluation was not in fact lower than the evaluation for the previous year, but was the same rating of "Superior," one rank below the highest level of "Outstanding." Plaintiff argues that by giving her the same rating as the previous year, Defendants failed to ensure that her evaluation reflected the additional work that she did while filling in for Undersheriff Talamo. (Pl. Opp'n Mem. 8.) While Plaintiff may have been able to make out an adverse action based on a negative evaluation as discussed above, the

---

[29] The Court considers this evaluation only with respect to Plaintiff's NYSHRL and § 1981 claims.

Court cannot characterize a positive evaluation as a negative one based solely on Plaintiff's belief that the evaluation should have been higher than it was.

### C. Failure to transfer

Plaintiff alleges that the failure of Defendants to provide her with an opportunity to transfer to a unit closer to her home in June 2009 was retaliatory. "A transfer denial is adverse when 'the sought for position is materially more advantageous than the employee's current position, whether because of prestige, modernity, training opportunity, job security, or some other objective indicator of desirability.'" *Moore v. Metro. Transp. Auth.*, --- F. Supp. 2d ---, ---, 2013 WL 4757527, at *11 (S.D.N.Y. Aug. 22, 2013) (quoting *Beyer*, 524 F.3d at 165); *but see Hodges v. Attorney Gen. of U.S.*, No. 11-CV-7735, 2013 WL 5510766, at *10 (S.D.N.Y. Sept. 30, 2013) ("assignment to the first floor communications room and the refusal to honor [the p]laintiff's 'bids' for an assignment to the third floor communications room" insufficiently adverse for Title VII discrimination or retaliation claim). As discussed above, even if, as Plaintiff argues, a transfer to a location closest to a lieutenant's home was a routine assignment to lieutenants, Plaintiff has not shown that she requested and was denied a transfer request. *Cf. Beyer*, 524 F.3d at 166 (2d Cir. 2008) (holding that "employee has established the 'adverse employment action" necessary to make out a *prima facie* case when she has proffered evidence from which a reasonable trier of fact could conclude that the transfer *sought and denied* would have involved an objective and significant improvement in the terms, conditions, or privileges of her employment" (emphasis added)); *Williams*, 368 F.3d at 128 (2d Cir. 2004) (noting that the plaintiff "must establish that [the defendant's] *denial of her request* for a transfer created a materially significant disadvantage in her working conditions"). In any event, even if Plaintiff had requested and was denied a transfer closer to her home, Plaintiff has not shown how

such a transfer to a location closest to her home would have been "materially" more advantageous, where there is no additional "prestige, modernity, training opportunity, job security, or some other objective indicator of desirability" associated with the location. *See Moore*, --- F. Supp. 2d at ---, 2013 WL 4757527, at *11.

### D. Sammarco's notes from the September 4, 2009 meeting

Plaintiff argues that Sammarco retaliated against her for filing a complaint against him in August 2006, by taking notes at a meeting in September 2009 that described Plaintiff as "unprofessional . . . while completely and conveniently ignoring the full context of the events at the meeting." (Pl. Opp'n Mem. 15.) Taking notes at a meeting that portray Plaintiff in a bad light is the type of "petty slights or minor annoyances that often take place at work and that all employees experience," and cannot, as a matter of law, be a material adverse action that would dissuade a reasonable employee from protesting discrimination in the workplace. *Cf. Burlington Northern*, 548 U.S. at 68; *Tepperwien*, 663 F.3d at 568 ("Personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable." (quoting *Burlington Northern*, 548 U.S. at 68) (alteration, citation and internal quotation marks omitted)).

### E. Request to fill in for a sergeant

At the September 4, 2009 meeting, Plaintiff was asked to fill in for a sergeant, a lower-ranked position, in the field. Although reassignment to a position that is objectively less prestigious can be considered materially adverse in the context of a retaliation claim, *see Kessler*, 461 F.3d at 209 (affirming finding that reassignment that led to tasks that were "dirtier, more arduous, and less prestigious" would have been materially adverse to a reasonable employee), a request that Plaintiff fill in on a few occasions for a lower-ranked individual is not similarly material in its adversity. Particularly in light of the evidence that Plaintiff eventually participated

in field duty only two or three times, and then only when another Lieutenant Zane, who normally was in the field with her unit, was not available, (Pl. Dep. 94:20–25, 99:13–24; Pl. 56.1 ¶ 109), the request and subsequent requirement to fill in for a sergeant in the field was not materially adverse.

### F. Aggregate impact of excessive scrutiny and criticism as of September 2009

Plaintiff alleges that, following the September 4, 2009 meeting and her filing an internal EEO complaint on September 11, 2009, her life became "unbearable," as she was subject to a flurry of counseling memoranda and monitoring of her work. (Compl. ¶ 29; Pl. Opp'n Mem. 16.) Specifically, Plaintiff claims that Defendants required her to work in the field, subjected her supervisor to a flurry of emails questioning and scrutinizing her performance, required her and then her entire unit to be in uniform at all times, and subjected her to two counseling memoranda, one for a jewelry infraction and one for making a statement inconsistent with the EEO policies of the Sheriff's Office. (Pl. Opp'n Mem. 15–17.) The Court recognizes that "even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks*, 593 F.3d at 165.

As discussed *infra*, section II.b.3, because Defendants' actions between September 4 and September 11, 2009 preceded Plaintiff's September 11, 2009 EEO complaint, and occurred more than three years after her August 2006 EEOC charge, they are not the result of retaliation against Plaintiff's complaints about discrimination.[30] However, Defendants actions subsequent to the filing of Plaintiff's September 11, 2009 EEO complaint can be considered for their material

---

[30] These actions include: The September 8, 2009 conversation her supervisor had with Plaintiff regarding her statements about her age, the September 10, 2009 email from LaRose to Plaintiff's supervisor, Doyle, asking Doyle to be sure to include Plaintiff's jewelry infraction in a quarterly report, and a September 4, 2009 conversation between Doyle and Plaintiff regarding her jewelry infraction.

adversity. These actions include: (1) giving Plaintiff a verbal and written reprimand regarding her comments about her age at the September 4, 2009 meeting as being in violation of agency EEO policy, (2) requiring Plaintiff to be in uniform at all times while on duty, and (3) including negative comments in Plaintiff's 2000–2010 evaluation. These actions, considered in the aggregate, could arguably dissuade a reasonable employee from complaining of discrimination.

Plaintiff received a counseling memorandum on October 13, 2009, discussing her comments about her age at the September 4, 2009 meeting. A formal reprimand can be an adverse action for purposes of a retaliation claim, "even when . . . the letter does not directly or immediately result in any loss of wages or benefits, and does not remain in the employment file permanently," because "it can reduce an employee's likelihood of receiving future bonuses, raises, and promotions, and it may lead the employee to believe (correctly or not) that his job is in jeopardy" *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 165 (2d Cir. 2011); *see also McAvey v. Orange-Ulster BOCES*, No. 07-CV-11181, 2012 WL 161839, at *3 (S.D.N.Y. Jan. 18, 2012) (letter of reprimand placed in plaintiff's file adverse action under *Burlington Northern*); *Mazyck*, 893 F. Supp. 2d at 591–92 (finding that the issuance of formal Letter of Instruction for tardiness was an adverse action for retaliation claim). Based on *Millea*, the Court will assume that the October 13, 2009 counseling memorandum is a material adverse action. Because there is no record of a counseling memorandum issued to Plaintiff regarding the jewelry infraction, the Court cannot assume this to be an adverse action.

The remaining actions by Defendants, considered together, could arguably dissuade a reasonable employee. For example, the comments appended by LaRose to Plaintiff's 2009–2010 evaluation may be considered the type of action that would dissuade an employee from bringing a charge of discrimination, even if the evaluation by her direct supervisor included a final rating

of "Superior."  Following the Supreme Court's decision in *Burlington Northern*, district courts in this Circuit have disagreed as to whether a negative performance evaluation, absent concrete negative consequences to the employee, is sufficient to support a retaliation claim.  Some courts have found that negative performance evaluations, standing alone, can be considered an adverse employment action.  *See Siddiqi v. N.Y.C. Health & Hospitals Corp.*, 572 F. Supp. 2d 353, 372 (S.D.N.Y. 2008) ("Unlike in discrimination claims, [for the purposes of a retaliation claim] negative performance reviews, standing alone, can be considered an adverse employment action." (citation omitted)); *Taylor*, 2012 WL 5989874, at *10 ("[N]egative performance reviews, standing alone, can be considered an adverse employment action for purposes of a retaliation claim." (citation and internal quotation marks omitted)).  Other courts have found that even for retaliation claims, a plaintiff must show that a negative performance evaluation resulted in concrete negative consequences to the employee.  *See Carmellino v. Dist. 20 of N.Y.C. Dep't. of Educ.*, No. 03-CV-5942, 2006 WL 2583019, at *32 (S.D.N.Y. Sept. 6, 2006) (granting summary judgment to employer on retaliation claim where plaintiffs "failed to produce . . . evidence of any negative consequences resulting from the [negative] evaluations"); *Ragin v. E. Ramapo Cent. Sch. Dist.*, No. 05-CV-6496, 2010 WL 1326779, at *17 (S.D.N.Y. Mar. 31, 2010) ("In the retaliation context . . . a negative or critical evaluation will not constitute an adverse employment action unless the evaluation is accompanied by other adverse consequences."), *aff'd*, 417 F. App'x 81 (2d Cir. 2011).

Mindful of the Second Circuit's emphasis that the inquiry into the materiality of a retaliatory action should focus on its objective likelihood of dissuading reasonable employees from challenging discrimination in the workplace, *see Hicks*, 593 F.3d at 165 and *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006), and viewing LaRose's actions in 2010

in light of his actions in 2006, the Court will treat LaRose's comments as adverse for purposes of Plaintiff's retaliation claim. LaRose, as the Chief of Operations, a supervisor two levels above Plaintiff and one or two levels below the Sheriff, went out of his way to include highly detailed information about three infractions by Plaintiff in her 2009–2010 evaluation, comments that Plaintiff's own supervisor refused to include in her evaluation. Judging from Plaintiff's evaluations from previous years, the inclusion of such specific written feedback did not comport with Plaintiff's prior evaluations. In light of such atypical scrutiny and written criticism in Plaintiff's evaluation, the Court will assume that a reasonable employee would be dissuaded by such attention. *See Frank v. Lawrence Union Free Sch. Dist.*, 688 F. Supp. 2d 160, 172 (E.D.N.Y. 2010) (finding that the drafting of "by far the harshest criticism of [plaintiff's] teaching techniques" was an adverse action for retaliation claim).

Plaintiff also argues that subsequent to her September 11, 2009 complaint, she was directed to wear a uniform at all times while on duty, and that she was singled out in this manner, Defendants subsequently issued a unit-wide directive to Kendra's Unit, requiring all officers to wear their uniform at all times. (Pl. Opp'n Mem. 17; Pl. Dep. 137:7–24; Pl. Ex. T.) On September 18, 2009, an email was sent throughout the agency instructing all uniformed personnel to be in uniform five minutes after the start of their shift. Plaintiff describes this email as "pretext," to cover up the fact that she had been singled out for the uniform requirement. Plaintiff explains that members of Kendra's Unit and other units, such as the Warrants Unit, had to be in uniform when they went out of the office on a call, but when they were inside the office they "were allowed" to be in civilian clothing. (Pl. Dep. 130:19–131:1.)

The imposition of a uniform requirement, by itself, is not a material adverse action. An employer's enforcement of its policies cannot be described as materially adverse, even if

Plaintiff was "singled out" for this requirement for a short period of time.[31] *See Moccio v.*

*Cornell Univ.*, 889 F. Supp. 2d 539, 586 (S.D.N.Y. 2012) ("It is not a materially adverse change

in a term or condition of employment to require an employee to adjust to organizational changes

or to report to a new supervisor, or for an employer to fail to explain to an employee the rationale

behind a policy change."), *aff'd*, 526 F. App'x 124 (2d Cir. 2013). However, the Court will

assume that when considered together with Defendants' other contemporaneous conduct, a

reasonable employee could be dissuaded. The Court therefore aggregates Defendants' actions

after September 11, 2009 and will assume that they are materially adverse.

### 3. Causation

To establish the causation prong of a *prima facie* case, Plaintiff must be able to show that

the retaliatory actions "closely followed," the protected activity or that there was a "reasonably

close temporal proximity" between the two. *Summa*, 708 F.3d at 128. The Second Circuit has

not "drawn a bright line to define the outer limits beyond which a temporal relationship is too

attenuated to establish a causal relationship," and has held that each case must be decided

according to its unique context. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (citation

omitted). The Second Circuit has held that seven months is not too long to establish a causal

relationship. *See Summa*, 708 F.3d at 128 ("The seven-month gap between [plaintiff's] filing of

the instant lawsuit and the decision to terminate her employment privileges is not prohibitively

remote." (citing *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45 (2d Cir. 1980))). However,

---

[31]   Although Plaintiff claims that there were "a couple of weeks" when she was required
to be in uniform before the directive was issued for the members of her unit to be in uniform at
all times, she complained to the EEO on September 11, 2009, about being targeted for discipline
after refusing to fill in for a sergeant, and the email requiring all members of Kendra's Unit to be
in uniform at all times was sent on September 18, 2009. Unless the directive to Plaintiff
preceded her September 11, 2009 EEO complaint, there was, at most, one week when Plaintiff
alone was required to be in uniform at all times.

fifteen months and two years are too long. *Woodworth v. Shinseki*, 447 F. App'x 255, 258 (2d Cir. 2011) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) and *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 447 (2d Cir. 1999)));

Here, Plaintiff's first protected activity took place in August 2006, when she filed an EEOC charge complaining of discrimination. The first, subsequent allegedly retaliatory action took place in June 2009, when Plaintiff was not transferred to an office closer to her home. As discussed above, this was not an adverse action. In addition, the nearly three-year time period between the filing of the 2006 EEOC charge and the June 2009 lack of transfer is too far removed in time for the Court to find that it was in retaliation for Plaintiff's protected activity. The next allegedly retaliatory adverse action was Defendants' request to Plaintiff to fill in for an injured sergeant in the field on September 4, 2009. Because more than three years elapsed between Plaintiff's filing of her EEOC charge in 2006 and the September 4, 2009 request, Plaintiff cannot rely on temporal proximity to show retaliatory discriminatory animus, and has no other evidence of such animus. Similarly, Defendants' actions in the week following the September 4, 2009 meeting — asking Plaintiff to fill in for an injured sergeant in the field, speaking to and emailing Plaintiff's supervisor about her jewelry infraction on September 10, 2009, and Doyle's verbal discussion with Plaintiff on September 4, 2009 regarding that jewelry infraction — occurred more than three years after Plaintiff's August 2006 EEOC charge, and is also too far removed in time to be caused by retaliation for filing the charge.

Thus, Plaintiff's remaining allegedly adverse actions subsequent to the filing of her September 11, 2009 EEO complaint, which the Court, as discussed above, considers in the aggregate, include (1) the imposition of a uniform requirement only as to Plaintiff, (2) the issuance of a verbal and written reprimand to Plaintiff, on October 13, 2009, regarding her

comments about age at the September 4, 2009 meetings, and (3) LaRose's written comments as an addendum to Plaintiff's 2009–2010 evaluation. The first of these actions, the imposition of the uniform requirement on Plaintiff occurred, according to Plaintiff, prior to September 18, 2009, the date on which an email directive requiring all units to be in uniform at all times was circulated. The second, the October 13, 2009 counseling memorandum for her statements about age, occurred approximately one month after Plaintiff's internal EEO complaint; both of these actions are sufficiently close in time to establish a *prima facie* causal connection. Nearly one year passed before LaRose included an addendum in Plaintiff's 2009–2010 performance evaluation documenting three of Plaintiff's infractions, including her statements about age, and although one year would normally be too long to be considered temporally proximate, LaRose's action in this case is more appropriately considered a documentation and renewal of the reprimand Plaintiff received on October 13, 2009, regarding her statements about age. Under these narrow circumstances, to the extent that it continues the adversity initiated in the month following Plaintiff's September 11, 2009 EEO complaint, the Court will assume them to be in sufficient temporal proximity to that complaint to establish Plaintiff's *prima facie* case of retaliation.

### ii. Nonretaliatory reason

Once a plaintiff establishes a *prima facie* case of retaliation, a presumption of retaliation arises and the defendant must articulate a legitimate reason for engaging in the adverse actions. *Fincher*, 604 F.3d at 720. With regard to the aggregated actions by Defendants subsequent to September 11, 2009, the evidence shows that these actions were almost all based on two infractions committed by Plaintiff on September 4, 2009, prior to her EEO complaint about discrimination: suggesting that age could be a qualifier for participating in field duty, and

wearing jewelry.  Defendants argue that Plaintiff "was given a counseling memorandum because she had used her age to attempt to get out of working in the field, and, as a manager, she was required to be instructed that she may not use age to apportion work assignments," (Defs. Mem. 19–20.)  This is a legitimate reason for the counseling memorandum and the verbal reprimand. Likewise, the policy of the Sheriff's Office, with which Plaintiff was familiar, requires that "earring or other adornments" not be worn while performing duty in uniform.  (Pl. Ex. Q; Pl. Dep. 106:15–107:13.)  The existence of this policy, combined with Plaintiff's conceded infraction in wearing jewelry on September 4, 2009 is a legitimate reason for the verbal reprimand that she received immediately after the meeting, as well as the written note appended to her evaluation the following year.  Defendants' additional conduct subsequent to September 11, 2009 — the requirement to be in uniform at all times while on duty, imposed first on Plaintiff, and then on all members of Kendra's Unit — is not an adverse action standing alone. However, even if it were, the evidence in the record shows that all Sheriff's Office personnel were required to be in uniform whenever they were out of the office, that being in civilian clothes in the office was an amenity and that Kendra's Unit occasionally received calls to attend to a situation in the field which required them to change out of their civilian clothing and into their uniform.  (*See* Pl. Dep. 131:8–132:1.) This is a legitimate reason for the requirement.

### iii.  Pretext

Even assuming that Plaintiff can establish a *prima facie* case of retaliation, Plaintiff cannot prove that but for her filing of an internal EEO complaint on September 11, 2009, she would not have been subject to intense scrutiny and monitoring.  Under the recent Supreme Court decision in *Nassar*, "Title VII retaliation claims must be proved according to traditional principles of *but-for* causation . . . . This requires proof that the unlawful retaliation would not

have occurred in the absence of the alleged wrongful action or actions of the employer." 570 U.S. at ---, 133 S. Ct. at 2533; *see also Kwan*, 737 F.3d at 845 ("[A] plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."). In order to establish but-for causation, Plaintiff must prove that his termination would not have occurred in the absence of a retaliatory motive. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Kwan*, 737 F.3d at 846.

Plaintiff cannot show that, but for her filing an internal EEO complaint on September 11, 2009, complaining that the Sheriff's directive requiring Plaintiff to fill in for a lower-ranked sergeant in the field was discriminatory, that Defendants would not have singled her out for discipline and scrutiny. Plaintiff argues that Defendants' explanation for the October 13, 2009 counseling memorandum and verbal reprimand which she received — that she had undermined the EEO policy of the Sheriff's Office — was pretext. Plaintiff claims that it was unreasonable, unfair, or untrue to depict her statement as an EEO violation as she was "merely" referencing her age to "describe her seniority and the length of her career at the Sheriff's Office." (Pl. Opp'n Mem. 16.) It is not the place of the Court to question Defendants' business decision to impose discipline, so long as retaliation for Plaintiff's protected activity was not one of the reasons. Whether Defendants' actions were unreasonable, unfair or even untrue, as Plaintiff alleges, without any showing of retaliatory motive, they do not support Plaintiff's retaliation claim. *See Miller v. Nat'l Assoc. of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230, 247 (E.D.N.Y.2010) ("The relevant inquiry is not whether the performance-based justification for plaintiff's termination

articulated by defendant is accurate or fair, but whether plaintiff can show any evidence that it was not the actual justification. Plaintiff cannot accomplish this by stating his disagreement with his supervisors' negative assessment of his performance, even [if he] has evidence that the decision was objectively incorrect." (alteration in original) (citations and internal quotations marks omitted)); *Delaney v. Bank of Am. Corp.*, 908 F.Supp.2d 498, 518 (S.D.N.Y.2012) ("The employer could terminate the plaintiff for a good reason, a bad reason, or no reason at all, so long as it was not a [retaliatory] reason.... Moreover, it is not for the Court to second-guess the business judgment for a termination, so long as there is no evidence that the reason for the decision was a pretext for [retaliation]." (quoting *Slatky v. Healthfirst, Inc.*, No. 02-CV-5182, 2003 WL 22705123, at *5 (S.D.N.Y. Nov.17, 2003))); *Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp.2d 230, 250 (N.D.N.Y.2010) ("[T]he fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." (citing *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 187 (E.D.N.Y.2008))); *Randall v. Potter*, No. 01–CV–2097, 2004 WL 439491, at *5 (S.D.N.Y. Mar.9, 2004) (finding that even if defendant-employer terminated plaintiff based on an incorrect belief that plaintiff had engaged in improper conduct, that belief did not establish an inference of discrimination).

Plaintiff points to the fact that other lieutenants were not singled out for discipline as evidence of Defendants' retaliatory animus. While Plaintiff alleges that at least one male lieutenant received only a verbal warning rather than a written warning for his first jewelry infractions, even if there was evidence to support this allegation, it would not assist Plaintiff in establishing retaliatory animus as Plaintiff's discipline for her jewelry infraction *preceded* her

EEO complaint. As for the discipline related to her statements about age, the record suggests that another lieutenant, Zane, made similar comments at the September 4, 2009 meeting that "safety concerns justify making field assignments based on age as a qualifier." (*See* Defs. Ex. N.) Yet Plaintiff has not shown that Zane did not receive a written warning in the same manner that Plaintiff did. Thus, there is no other evidence connecting the Defendants' decision to discipline Plaintiff with her protected activity. The Court finds that Plaintiff has not met her burden to show that Defendants' explanation is pretextual.

As for LaRose's comments appended to Plaintiff's August 30, 2010 evaluation, although Defendants have not proffered a nondiscriminatory reason for the comments, the record establishes that the comments were all based on actual infractions committed by Plaintiff on September 4, 2009. The fact that two out of three of LaRose's comments merely restate discipline that had already been imposed on Plaintiff in some form prior to September 11, 2009, also weighs against a finding of retaliatory animus. *See Porter v. Potter*, 366 F. App'x 195, 197 (2d Cir. 2010) ("Adverse employment actions that are part of an 'extensive period of progressive discipline' that begins prior to any protected activity on the plaintiff's part cannot give rise to an inference of retaliation . . . ." (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001))). Plaintiff cannot show that LaRose's reasons for including these comments in her evaluation was filled with "weaknesses, implausibilities, inconsistencies, or contradictions" to raise an inference that the comments were pretext. *See Kwan*, 737 F.3d at 846.

Nor does Plaintiff's contention that no other lieutenant was "singled out" for excessive criticism over such minor, technical infractions, raise an inference of pretext. Plaintiff's allegations are largely conclusory and based on Plaintiff's testimony alone, but Plaintiff has not established that she has any personal knowledge of the discipline that was or was not received by

other lieutenants.  Without any other evidence in the record, there is nothing to suggest that retaliation was the but-for cause of LaRose's negative comments about Plaintiff.  *See Adamczyk v. New York Dep't of Corr. Servs.*, 474 F. App'x 23, 27 (2d Cir. 2012) (finding that plaintiff "has failed to adduce evidence to enable a reasonable juror to find that he and the officers in question were similarly situated" (citing *Graham*, 230 F.3d at 43)).

As to the imposition of the uniform requirement, this action by Defendants, standing alone, cannot be considered adverse, and in the absence of evidence that, but for her complaint of September 11, 2009, Defendants would not have imposed the other discipline that they did, Plaintiff cannot establish that Defendants' reason for imposing the uniform requirement was pretextual.

Because Plaintiff cannot show that retaliatory animus was the but-for cause of Defendants' actions subsequent to Plaintiff's September 11, 2009 EEO complaint, the Court grants Defendants' motion for summary judgment and dismisses Plaintiff's claims of retaliation under Title VII, the NYSHRL and § 1981.

## g. Hostile work environment – Title VII, the NYSHRL, § 1981 and § 1983

Plaintiff has failed to establish a hostile work environment claim under Title VII, the NYSHRL, § 1981 and § 1983.  In order to establish a hostile work environment claim, a plaintiff must produce evidence "that the complained of conduct (1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's" protected characteristic.  *Robinson v. Harvard Prot. Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d

Cir. 2007)).[32]  To withstand summary judgment, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012) (quoting *Gorzynski*, 596 F.3d at 102).  "In considering whether a plaintiff has met this burden, courts should 'examin[e] the totality of the circumstances, including:  the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance.'"  *Rivera*, 702 F.3d at 693–94 (alteration in original) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003)).  Periodic and episodic incidents are not sufficient to establish hostile work environment claims.  *See Coach Stores*, 202 F.3d at 570 ("Isolated instances of harassment ordinarily do not rise to this level."); *Das v. Consol. Sch. Dist. of New Britain*, 369 F. App'x. 186, 189–90 (2d Cir. 2010) ("Generally, unless an incident of harassment is sufficiently severe, [the] 'incidents [comprising a hostile work environment claim] must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002))); *see also Redd*, 678

---

[32]  The same standards apply to a plaintiff's hostile environment claim arising under the NYSHRL, § 1981 and § 1983.  *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, --- F. App'x ---, 2014 WL 518791, at *5 n.4 (2d Cir. Feb. 10, 2014) ("The same standards [as are applied to Title VII] apply to the plaintiffs' hostile environment claims arising under the NYSHRL, and to their claims arising under 42 U.S.C. § 1981" (citing, *inter alia*, *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000))); *Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013) ("Hostile work environment claims under both [federal law] and the NYSHRL are governed by the same standard." (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006))); *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) ("[Section] 1983 and the Equal Protection Clause protect public employees from various forms of discrimination, including hostile work environment . . . on the basis of gender.  Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII . . . .").

F.3d at 175–76 ("Isolated incidents usually will not suffice to establish a hostile work environment, although we have often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently 'severe.'").

Plaintiff presents two theories of a hostile work environment based on Plaintiff's race and gender: (1) sexual harassment by Sammarco and (2) the creation of a "demeaning" hostile workplace environment based on harassment. (Oral Arg. Tr. 79:24–80:1.)

### i. Sexual harassment claim — Title VII, the NYSHRL and § 1983

Plaintiff's sexual harassment claim is based on the actions of Sammarco, who, (1) issued the "window directive" in 2006 which, according to Plaintiff, left her, the only female lieutenant, without the same level of privacy as other male lieutenants and permitted Sammarco to look into her office, (2) renewed this directive in 2010, and then threatened to charge Plaintiff with insubordination when she failed to comply with the directive, (3) followed Plaintiff in a menacing manner, staring and leering at her, and passing by her office as much as 20 times per day, in 2006, and (4) in December 2010 followed her into the garage one afternoon and "glar[ed]" at her while she drove out of the garage.[33]

As discussed above, Sammarco's actions in 2006 are time-barred from consideration under Title VII, § 1983 and the NYSHRL. In addition, as discussed *supra* in section II.b, these

---

[33] Section 1981 only prohibits discrimination on the basis of race, ancestry or ethnicity. *See Runyon v. McCrary*, 427 U.S. 160, 167 (1976) ("42 U.S.C. § 1981 is in no way addressed to [gender or religion]"); *Whidbee*, 223 F.3d at 69 ("Section 1981 provides a cause of action for race-based employment discrimination based on a hostile work environment."); *Alexander v. City of New York*, 957 F. Supp. 2d 239, 247 (E.D.N.Y. 2013) ("[Section] 1981 does not provide a claim for gender-based employment discrimination." (citing *Runyon*, 427 U.S. at 167); *Hussein v. Sheraton New York Hotel*, 100 F. Supp. 2d 203, 206 (S.D.N.Y. 2000) ("Section 1981's prohibition against racial discrimination has only been expanded to include discrimination based on ancestry or ethnic characteristics." (citing *St. Francis College v. Al–Khazraji*, 481 U.S. 604, 613 (1987) and *Magana v. Com. of Northern Mariana Islands*, 107 F.3d 1436, 1446–47 (9th Cir. 1997))). Accordingly, Plaintiff's sexual harassment claim is not considered under this statute.

actions are also barred because they were the subject of Plaintiff's 2006 EEOC charge, for which she received a right-to-sue letter and did not bring a lawsuit within 90 days, waiving her right to sue on these claims. Although the Court draws on them to contextualize Sammarco's actions in 2010, even with that backdrop, Sammarco's actions in 2010 — following Plaintiff into a garage in a menacing manner, and threatening to charge Plaintiff with insubordination for refusing to remove a window covering from her office — are not sufficiently severe and do not rise to the level of "extraordinarily serious" that could comprise a hostile work environment violation. "Isolated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010). A single act of being followed and glared at, even in an intimidating manner, is insufficient by itself to support a claim for a hostile work environment. *See Russo*, --- F. Supp. 2d at ---, 2013 WL 5346427, at *13 (E.D.N.Y. Sept. 23, 2013) (single instance of profanity-laced screaming at plaintiff insufficient to establish a hostile work environment); *Trachtenberg v. Dep't of Educ. of City of New York*, 937 F. Supp. 2d 460, 472 (S.D.N.Y. 2013) (allegations that plaintiff "was subjected to excessive scrutiny, . . . [that her principal] would 'frequently stand in the area and stare at [her] in an effort to intimidate [her], . . . that she received negative performance evaluations . . . [and] was moved to a poorly ventilated, windowless office, [and] was refused training opportunities" insufficient to establish "severe or pervasive" element of hostile work environment claim); *Hunt v. Arthur Kill Corr. Facility,* No. 11-CV-2432, 2012 WL 7658364, at *6 (E.D.N.Y. Oct. 9, 2012) ("allegations that one sergeant complimented her appearance on one occasion and another looks her up and down, do not state a plausible hostile work environment/sexual harassment claim"); *Spina v. Our Lady of Mercy Med. Ctr.*, No. 97-CV-4661, 2003 WL 22434143, at *3 (S.D.N.Y. Oct. 23, 2003) (supervisor's comment that plaintiff

looked good in tight pants, his leering at plaintiff, referring to plaintiff as a "bitch" twice, following her to the restroom door, yelling at her for no reason, and pointing his finger in her face were not sufficiently severe or pervasive to constitute a hostile work environment), *aff'd*, 120 F. App'x 408 (2d Cir. 2005). The Court recognizes Plaintiff's argument that Sammarco's act of following Plaintiff into the garage must be understood in context with Sammarco's actions in 2006 of allegedly walking past Plaintiff's office 20 times a day and his "staring" at her in a "menacing" manner. (Pl. 56.1 ¶ 77.) Even in light of these past acts, Sammarco's actions are insufficient to render Plaintiff's environment "hostile or abusive." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993).

Similarly, Sammarco telling Plaintiff's supervisor that he would charge Plaintiff with insubordination if she continued to refuse to remove the window covering on her office door, even in light of Sammarco's past actions with regard to the "window directive," are not so severe as to alter Plaintiff's conditions of employment. An isolated threat of discipline that is not acted upon is insufficient to contribute to the creation of a hostile work environment. *See Alfano*, 294 F.3d at 378 (finding that memorandum placed in plaintiff's personnel file, the merely "good" evaluations, formal counseling and an internal investigation of plaintiff, were insufficient to establish hostile work environment); *Wooten-Francis v. City of New York*, No. 12-CV-2341, 2013 WL 6729851, at *7 (E.D.N.Y. Dec. 19, 2013) (finding that threat to "write up" plaintiff that was never carried out, combined with two derogatory statements about plaintiff were insufficient to establish hostile work environment under city, state or federal law). While "'the central statutory purpose [of Title VII was] eradicating discrimination' in employment, Title VII 'does not set forth a general civility code for the American workplace." *Redd*, 678 F.3d at 176 (alteration in original) (quoting *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 771 (1976) and

*Burlington Northern*, 548 U.S. at 68).

In addition, to the extent that Plaintiff argues that Sammarco created an uncomfortable working environment for other African-American women, (*see* Pl. Dep. 232:5–234:14), Plaintiff has not presented sworn statements or other admissible evidence of other people's experiences, but instead relies on her own hearsay statements about the experiences of others, which are inadmissible at the summary judgment stage. *See DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("[W]here a party relies on affidavits or deposition testimony to establish facts [on a motion for summary judgment], the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" (citing Fed. R. Civ. P. 56(c)(4) and Fed. R. Evid. 602)); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

Finally, in considering the "totality of circumstances" related to Plaintiff's allegations of sexual harassment, Sammarco's act of following Plaintiff into the garage on one occasion, even when combined with his threat to discipline her for not removing the covering from her window, does not rise to the level of effectively altering the conditions of Plaintiff's work environment.

In sum, Sammarco's actions fall on the dismissal side of the "line between complaints that are easily susceptible to dismissal as a matter of law," as they do not amount to the creation of an objectively hostile and abusive work environment on the basis of Plaintiff's gender. *See Redd*, 678 F.3d at 177 ("On one side lie complaints of sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; and obscene language or gestures . . . . On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.").

### ii. Creation of demeaning workplace claim

Plaintiff argues that being assigned to the undesirable Kendra's Unit and the title of Administrative Lieutenant, and being denied a transfer to a location near her home in June 2009, and being subject to a barrage of disciplinary actions and excessive scrutiny subsequent to the September 4, 2009 meeting, comprise a hostile work environment that undermined Plaintiff's authority as a Lieutenant.[34] Examining the "severity, frequency, and degree of the alleged abuse," the Court finds that Defendants' actions are not "sufficiently severe or pervasive to [have] alter[ed] the conditions of [plaintiff's] employment and create an abusive working environment." *Alfano*, 294 F.3d at 374.

Plaintiff argues that her assignment to Kendra's Unit was an undesirable and demeaning assignment for her. A hostile work environment can be created through the inappropriately menial assignments that invoke outdated stereotypes of gendered work. *See, e.g.*, *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 191 (E.D.N.Y. 2008) (finding that plaintiff who was "forced to perform subservient secretarial and custodial duties" by supervisor who referred to her as "my girl," where male officers with same title were not so required, had established *prima facie* adverse action at summary judgment stage). However, as discussed *supra* II.c.i.1.B, while Plaintiff's assignment to Kendra's Unit struck her as redundant with the lieutenant who was already in charge of that unit, Plaintiff does not claim that she performed tasks outside of her job description during her time at Kendra's Unit. While Plaintiff indicates that the "made up" title of Administrative Lieutenant was inappropriate, and that assignment to the unit was undesirable, she cannot substantiate the claim that the assignment ultimately had a "severe" or "pervasive"

---

[34] The Court considers this hostile work environment claim under Title VII, NYSHRL, § 1981 and § 1983. *See Whidbee*, 223 F.3d at 69 ("Section 1981 provides a cause of action for race-based employment discrimination based on a hostile work environment.")

impact on her working conditions, even considered in conjunction with Defendants' other allegedly hostile conduct. *See Parekh v. Swissport Cargo Servs., Inc.*, No. 08-CV-1994, 2009 WL 290465, at *5 (E.D.N.Y. Feb. 5, 2009) (granting motion to dismiss hostile work environment claim where "[p]laintiff's complaints concerning unfair disciplinary actions, shift changes, reduction in manpower, wrongfully withheld vacation time, failure to provide him with proper equipment, workplace transfers, failure to promote, and his termination contain no suggestion of hostility or offensiveness"). As for the denial of a transfer in June 2009, assuming that Plaintiff constructively requested such a transfer, Defendants' failure to afford Plaintiff the opportunity to transfer to an office closer to her home, even when considered in conjunction with their assigning Plaintiff to an undesirable unit, did not contribute to an "abusive working environment." *See Rivera*, 702 F.3d at 693.

The actions beginning in September 2009 that Plaintiff describes as creating a hostile work environment include: (1) being asked to fill in for an injured sergeant, and later being made to fill in for a sergeant in the field on a few occasions, (2) being the subject of "unfair" notes that misrepresented her actions at the September 4, 2009 meeting, (3) being singled out for reprimands for wearing jewelry, and (4) receiving verbal and written reprimands for raising her age in protest to the request that she participate in field duty. Assuming that Plaintiff can establish that these actions were based on her race and/or gender, these actions nevertheless were not so "severe" or "pervasive" that they altered the conditions of Plaintiff's employment.

Plaintiff received verbal and written counseling regarding her wearing of jewelry and her statements at the September 4, 2009 meeting about her age for approximately one month, a short period of time, with the addition of one set of negative evaluation comments that occurred one year later. As for being asked to fill in for a sergeant in the field, while Plaintiff subjectively felt

that lieutenants should not be required to serve in the field, there is no evidence in the record to indicate that as a lieutenant, she was insulated from having to perform this duty. Nor is there evidence that its performance was particularly onerous. Although Plaintiff testified that it was a demeaning request, as there were 18 other sergeants that could have filled in for the injured sergeant, she admitted that shortly after she received the order to participate in field duty, a directive was issued requiring all lieutenants to perform field duty for 1.5 hours per week, and that she went into the field a total of two or three times, only when Lieutenant Zane, who normally was in the field with her unit, was not available. (Pl. Dep. 94:20–25, 99:13–24; Pl. 56.1 ¶ 109.) Based on Plaintiff's representation, although the initial request that Plaintiff fill in for a sergeant in the field — which would have required daily field duty — may have been humiliating for Plaintiff and any lieutenant, ultimately Plaintiff's actual participation in field duty appeared to have been only to replace another supervising lieutenant in the field. (*See* Pl. 56.1 ¶ 109.) Accordingly, neither the one-time directive, even if it was made in a meeting with other co-workers, nor Plaintiff's actual performance of a job responsibility shared by other lieutenants, create or contribute to the creation of a hostile work environment.

Likewise, Defendants' enforcement of its uniform policies amounted to the taking away of a convenience "enjoyed" by all the Sheriff's Office personnel, but was still within Defendants' purview.[35] In the absence of evidence that Defendants' enforcement of the policy of the Sheriff's Office — however bureaucratic and technical it may have been — resulted in any sort of material change in Plaintiff's work environment, the Court cannot consider that enforcement to have altered the conditions of Plaintiff's work environment. In sum, the Court

---

[35] Plaintiff testified that they were required to be in uniform anytime they were in the field, and if they received an urgent call to dispatch into the field, they would take approximately five minutes to get changed before leaving the office. (Pl. Dep. 133:22–25.)

does not find that the actions in 2009, along with Defendants' prior actions regarding Plaintiff's assignments between 2006 and 2009, created an abusive or hostile work environment. Plaintiff's Title VII, NYSHRL, § 1981 and § 1983 hostile work environment claims are dismissed.

### h. First Amendment retaliation

Plaintiff claims that Defendants retaliated against her in violation of her First Amendment rights. Plaintiff argues that she engaged in First Amendment-protected activity because she is an active member of the Board of the union that published a "whistle-blowing" photograph highlighting the wrongdoing of a First Deputy in the Sheriff's Office. (Pl. Opp'n Mem. 17.) In retaliation for this photograph being published, which was published several weeks after the September 4, 2009 meeting, Defendants "began to scrutinize Plaintiff very strictly, as she received numerous counseling memorandums, while her supervisor, Undersheriff Doyle, was constantly questioned by Defendants about Plaintiff's activities." (Pl. Suppl. Brief 2; Pl. Dep. 212:13–18.)

"To state a First Amendment retaliation claim, a plaintiff must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Puglisi v. Town of Hempstead, Dep't of Sanitation, Sanitary Dist. No. 2*, --- F. App'x ---, ---, 2013 WL 5663223, at *2 (2d Cir. Oct. 18, 2013) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)); *see also Adams v. Ellis*, 536 F. App'x 144, 144 (2d Cir. 2013); *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 27 (2d Cir. 2012); *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008). "[T]he First Amendment protects a public employee from retaliation by his or her employer for the employee's speech only if 'the employee sp[eaks] [1] as a citizen [2] on a matter of public concern.'" *Singer v. Ferro*, 711 F.3d

334, 339 (2d Cir. 2013) (alteration in original) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)); *see also Garcia v. Hartford Police Dep't*, 706 F.3d 120, 129–30 (2d Cir. 2013) ("[T]he plaintiff must show that . . . the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest . . . ." (citation and internal quotation marks omitted)); *Spencer v. Philemy*, 540 F. App'x 69, 70 (2d Cir. 2013) ("[T]he First Amendment protects a public employee from retaliation by his or her employer for the employee's speech only if 'the employee sp[eaks] [1] as a citizen [2] on a matter of public concern.'" (alterations in original) (quoting *Singer*, 711 F.3d at 339)). The Second Circuit has held that the "public concern" requirement applies to associational conduct in addition to speech. *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004).

In the context of unions, "[t]here is no doubt that retaliation against public employees solely for their union *activities* violates the First Amendment." *Buckley v. New York*, 959 F. Supp. 2d 282, 298 (E.D.N.Y. 2013) (emphasis added) (quoting *Clue v. Johnson,* 179 F.3d 57, 60 (2d Cir. 1999)). The Second Circuit has not held, however, that union *membership*, in and of itself, comprises "protected activity," *see Cobb*, 363 F. 3d at 107, but several district courts have reached this conclusion, *see Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 509 (E.D.N.Y. 2011) ("[A]n employee's association with a union, as well as any speech that arises from his or her position in a union, is constitutionally protected under the First Amendment."); *Buckley*, 959 F. Supp. 2d at 298 ("the Court finds that the Plaintiff's union membership satisfies the public concern requirement."); *Donovan v. Inc. Vill. of Malverne,* 547 F. Supp. 2d 210, 218 (E.D.N.Y. 2008) (finding that "the plaintiff's union membership, in and of itself, is enough to satisfy the public concern element").

Plaintiff alleges that she engaged in constitutionally protected activity by being active on the board of a union, which published a photograph of First Deputy Pu-Folkes attired in inappropriate uniform at the September 2009 United Nations detail.[36]  Plaintiff alleges that as a result of the publication of this photograph, she was threatened with going into the field and received multiple counseling memoranda.  (Compl. ¶¶ 30–31; Pl. Opp'n Mem. 17.)  Assuming without deciding that Plaintiff's leadership in the union is sufficient for the union's First Amendment activity to be attributed to Plaintiff, Plaintiff cannot establish that Defendants took an adverse employment action against her as a result of said activity.  In the context of a First Amendment retaliation claim, "a public employee plaintiff alleging retaliation in violation of the First Amendment [need not] demonstrate a material change in employment terms or conditions." *Zelnik v*, 464 F.3d at 227.  Rather, the "standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in *Burlington Northern*" — that the action would dissuade a reasonable employee from speaking out.  *Id*.  Put another way, an adverse action is one that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Nixon v. Blumenthal*, 409 F. App'x 391, 392 (2d Cir. 2010).  Examples of such actions include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," *Frisenda*, 775 F. Supp. 2d at 510 (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir. 1999).  However, "lesser actions may also be considered adverse employment actions," since "a combination of seemingly minor incidents [can] form the basis of a constitutional retaliation claim once they reach a critical mass." *Id*. (citing *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002)).

---

[36]  Plaintiff testified that the union published the photograph in late September or early October.  (Pl. Dep. 210:18–25.)  The United Nations detail where the photograph was taken took place the week of September 21, 2009.  (Pl. Ex. X, Memorandum dated September 17, 2009 from Office of the City Sheriff.)

Plaintiff's claim is that, as a result of her protected First Amendment activity, she suffered a series of memoranda from LaRose to her supervisor, Doyle, inquiring about what Plaintiff was doing, how long it took for her to do it, and asking "why wasn't she a part of" other activities. (Pl. Dep. 214:7–20.) There is no evidence that any of these requests were directed to Plaintiff, or that she was reprimanded or otherwise affected by these memoranda. The memoranda to Plaintiff's supervisor are not sufficient to meet the standard for "adverse employment action" for purposes of a First Amendment claim. Plaintiff's First Amendment retaliation claim is dismissed.

### i. NYCHRL claims

Plaintiff brings claims of discrimination, retaliation and hostile work environment pursuant to the NYCHRL. "District courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citations and internal quotation marks omitted); *see also One Communications Corp. v. J.P. Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims."); *Sullivan v. City of New York*, No. 10-CV-0038, 2011 WL 3806006, at *6 (S.D.N.Y. Aug. 29, 2011) ("[W]here federal claims are dismissed before trial, the state [claims] should be dismissed as

well." (quoting *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998))).  The Court declines to exercise supplemental jurisdiction to address Plaintiff's claims under the NYCHRL.

### III.  Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to all of Plaintiff's claims under federal and state law, and declines to exercise jurisdiction over Plaintiff's claims under the NYCHRL.  The Court dismisses Plaintiff's claims under the NYCHRL without prejudice.  The Clerk of the Court is directed to close the case.

SO ORDERED:


_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 31, 2014
        Brooklyn, New York